
UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| SIOUX FALLS KENWORTH, INC., d/b/a ISUZU TRUCKS OF SIOUX FALLS, <br><br> Plaintiffs, <br><br> vs. <br><br> ISUZU COMMERCIAL TRUCK OF AMERICA, INC., <br><br> Defendant. | 4:14-CV-04187-RAL <br><br><br> OPINION AND ORDER ON POST-TRIAL MOTIONS |

Sioux Falls Kenworth Inc., doing business as Isuzu Trucks of Sioux Falls (SFK), sued Isuzu Commercial Truck of America Inc. (Isuzu) asserting various statutory, contractual, and quasi-contractual claims relating to Isuzu's termination of SFK's Isuzu dealership and Isuzu's handling of SFK's claims for payment for warranty-covered service work. After a mixed jury verdict awarding SFK $1,676,000 in damages, Isuzu moved for remittitur, Doc. 148, judgment as a matter of law, Doc. 150, and a new trial, Doc. 154. SFK moved for an award of attorney's fees. Doc. 156. For the reasons explained below, this Court denies Isuzu's motion for a new trial on the condition that SFK accept a partial remittitur of the damages, denies Isuzu's motion for judgment as a matter of law, and grants SFK's motion for attorney's fees.

## I. Facts

SFK is a truck dealership located in Sioux Falls, South Dakota. It sells Kenworth, Volvo, and Hino trucks, as well as several trailer lines. Doc. 138-1 at 33. SFK is owned by North

American Truck and Trailer (NATT), a holding company that owns seventeen dealerships in four different states. Doc. 138-1 at 32–33, 129–32. William Rush is the president of NATT, and he and his family own the company in its entirety. Doc. 138-1 at 31, 33.

SFK's management includes Rush,[1] his son Michael Rush, Dan Mills, and Doug Wersal. Doc. 138-1 at 35. Rush's son Michael is the vice president of sales, responsible for managing SFK's sales force and vehicle inventory. Doc. 138-1 at 36. Mills is SFK's fleet service manager, a position that gives him authority to implement policies and procedures for all of NATT's service departments. Doc. 138-1 at 37; Doc. 138-2 at 77. Mills works from an office in his home in Geddes, South Dakota, where he also farms. Doc. 138-2 at 98–100. Wersal oversees SFK's parts department. Doc. 138-1 at 40, 154; Doc. 138-3 at 39.

In January 2010, SFK entered into a franchise agreement with Isuzu to sell and service Isuzu products. Doc. 138-1 at 42; Pl.'s Ex. 4. SFK did not pay Isuzu anything for the franchise agreement, but did purchase its own Isuzu parts, tools, inventory, and signage. Doc. 138-1 at 135. Article V.A.3. of the franchise agreement provided that if Isuzu desired to terminate the agreement for a failure of performance, Isuzu would "endeavor to review" the failures with SFK and would determine, based on a plan proposed by SFK, whether SFK could remedy its failures, and if so, then allow SFK a reasonable amount of time in which to remedy any failure. Doc. 47-6 at 47; Pl.'s Ex. 4. If, however, Isuzu terminated the franchise agreement for one of the reasons listed in Article V.A.2., including SFK's submission of a "false or fraudulent" warranty reimbursement claim, then the review procedure described in Article V.A.3. of the agreement did not apply. Doc. 47-6 at 46–47; Pl.'s Ex. 4. In 2011, NATT's dealership in Rapid City—Black

---

[1] This Opinion and Order uses "Rush" to refer to William Rush. To refer to Michael Rush, this Opinion and Order uses "Michael" or the full name.

Hills Truck and Trailer—also obtained an Isuzu franchise, which it still has today. Doc. 138-1 at 43, 133–34.

SFK's customer base for Isuzu trucks was mainly local. Doc. 138-1 at 41–42. National companies with a presence in Sioux Falls like Schwan's Company and Fed Ex Corporation would purchase "mega-fleets" of Isuzu trucks elsewhere, so SFK could not easily penetrate the mega-fleet market. Doc. 138-1 at 41–42. Accordingly, SFK only sold six new Isuzu trucks during its approximately five years as an Isuzu dealer. Doc. 138-1 at 50; Pl.'s Ex. 2. SFK's primary activity as an Isuzu dealer was the sale of parts for and service on Isuzu mega-fleets that were purchased elsewhere but used in the Sioux Falls area. Doc. 138-1 at 47, 50–51.

Dawn Cunningham, a district parts and service manager for Isuzu who oversaw Isuzu's franchise relationship with SFK and multiple other dealerships, testified that Isuzu deemed SFK a "telecontact" dealer, a designation that Isuzu assigned to vehicle dealers in smaller markets. Doc. 138-5 at 12. SFK's status as a telecontact dealer meant that Isuzu would communicate with SFK through email and telephone rather than traveling to Sioux Falls. Doc. 138-4 at 132–33; Doc. 138-5 at 12. Cunningham explained that she would visit a telecontact dealer if asked, but that SFK never made such a request. Doc. 138-4 at 133.

As an Isuzu franchise holder, SFK would do warranty repairs on Isuzu vehicles and then seek reimbursement from Isuzu for such repairs. Vehicle dealers like SFK use a computerized communication system called ICS to submit their claims for warranty work to Isuzu. Doc. 138-2 at 115–16; Doc. 138-4 at 136, 141. Isuzu has a guide that lists the standard repair times allotted for dealers to fix particular issues covered by warranty. Doc. 138-1 at 90; Doc. 138-2 at 106–07; Doc. 138-4 at 136; Doc. 138-5 at 41, 51, 146–47. If the dealer is unable to fix the problem within the standard repair time, it can request payment for these "other labor hours" (OLH) from

Isuzu. Doc. 138-4 at 136; see also Doc. 138-1 at 90, 157; Doc. 138-5 at 150–51. Isuzu had informed SFK and other dealers that they must explain their requests for OLH. Def.'s Ex. 124; Doc. 138-4 at 139.

By September 2013, Isuzu and SFK were having issues over the warranty claims SFK submitted. On September 11, 2013, Cunningham emailed Mills about some warranty claims Mills had submitted that were beyond the usual 90-day period for claims submission. Def.'s Ex. 130; Doc. 138-4 at 145–150. Cunningham also asked Mills for the repair orders and other documentation on some of the claims he submitted so that she could determine whether the OLH Mills requested was justified. Def.'s Ex. 130; Doc. 138-4 at 148. Mills apologized that the claims were late and said that it would not happen again because he had restructured the service department. Def.'s Ex. 130; Doc. 138-2 at 189. This restructuring included Mills assuming responsibility for submitting warranty claims to Isuzu for work performed by SFK's service department. Doc. 138-1 at 37; Doc. 138-2 at 74, 99–100, 164–66, 189. Before Mills took over, Sarah Lee and then Verlyn Wiertzema submitted warranty claims to Isuzu, and there appeared to be few issues with SFK's warranty work or Isuzu's payment thereof when Lee and Wiertzema were submitting warranty claims. Doc. 138-2 at 164–65.

On September 14, 2013, Cunningham emailed Mills to tell him that she was returning four of the warranty claims discussed in the September 11, 2013 email because Mills had yet to send the repair orders and other documents she had requested. Def.'s Ex. 130; Doc. 138-4 at 150. Mills did not send the requested repair orders and other documents until October 3, 2013. Doc. 138-4 at 150–51; Def.'s Exs. 131–134. Cunningham emailed Mills on October 4 asking for a repair order on a particular claim. Doc. 138-4 at 152; Def.'s Ex. 137. When Mills did not respond, Cunningham emailed him again on October 8 asking him to send the repair order

4

"ASAP." Def.'s Ex. 137. Nearly two months passed before Mills sent the repair order on December 4, 2013. Doc. 138-4 at 153–54; Def.'s Ex. 140. Cunningham emailed Mills the following day saying that she was returning two claims to Mills because they lacked an adequate explanation for OLH. Def.'s Ex. 142; Doc. 138-4 at 155–56. Cunningham reiterated to Mills that claims for OLH required detailed explanations. Def.'s Ex. 142.

On December 17, 2013, Mills emailed Cunningham asking her to increase the rate Isuzu paid for parts SFK used in Isuzu warranty repairs. Def.'s Ex. 210; Doc. 138-2 at 14. Under South Dakota law, the reimbursement a manufacturer pays a vehicle dealer for parts the dealer uses in warranty repairs "may not be less than the current retail rate customarily charged by the vehicle dealer for such parts." South Dakota Codified Laws (SDCL) § 32-6B-61. Section 32-6B-61 states that when establishing a compensation schedule for warranty work, manufacturers "shall rely on the vehicle dealer's written schedule of hourly labor rates and parts and may not obligate any vehicle dealer to engage in unduly burdensome documentation thereof, including, without limitation, obligating vehicle dealers to engage in transaction by transaction calculations." Id. Mills told Cunningham in one of his December 2013 emails that "other manufacturers" were paying a 72% parts markup on warranty repairs. Def.'s Ex. 210; Doc. 138-2 at 14.

In late December 2013, Isuzu granted SFK's request for an increase in the hourly rate Isuzu paid SFK for labor on warranty repairs. Def.'s Ex. 267; Doc. 138-4 at 214. Around that same time, Mills emailed Cunningham expressing frustration that Isuzu had not paid a particular warranty claim even though he had submitted a repair order explaining the claim over two weeks earlier. Def.'s Ex. 148. He asked Cunningham if she would be in the office the following day, and Cunningham replied that she would. Def.'s Ex. 148. Cunningham wrote in an email that

she was happy to discuss any claims Mills wanted, but Mills never called her. Def.'s Ex. 148; Doc. 138-4 at 158–59.

In early January 2014, Mills emailed Cunningham that SFK's markup rate on Isuzu parts was 66%. Def.'s Exs. 153, 213; Doc. 138-2 at 15–16. He attached four identical invoices as proof of a 66% retail markup rate charged by SFK. Doc. 138-4 at 198–200; Def.'s Ex. 216. Later that month, Cunningham asked Mills for fifty consecutive repair orders to establish the retail rate SFK customarily charged. Def.'s Ex. 217; Doc. 138-4 at 201. Mills neither provided the fifty consecutive repair orders nor called Cunningham to talk about her request. Doc. 138-4 at 201–02. Instead, Mills sent Cunningham a follow-up email on February 25, 2014, stating that although he knew Cunningham had requested more information, he "did not have any" and, in any event, "in our state all we need to do is display what our system is set at." Def.'s Ex. 219. Mills reiterated in the email that he would be satisfied with a 66% markup rate on Isuzu parts. Def.'s Ex. 219.

In the spring of 2014, Isuzu requested a meeting with SFK to discuss SFK's sales and warranty claims. Doc. 138-1 at 150–51; Doc. 138-4 at 164–65. Isuzu arranged for Cunningham, Isuzu's central region director Mike Donaldson, and Isuzu's life-cycle business manager Patrick Becker to travel to Sioux Falls to meet with SFK on May 12, 2014. Def.'s Ex. 113; Doc. 138-1 at 153–54; Doc. 138-4 at 169; Doc 138-5 at 62; Doc. 138-5 at 117–18. Although Michael Rush knew of the planned meeting and Cunningham had sent Mills an email telling him about it, neither man attended. Doc. 138-1 at 151; Doc. 138-2 at 147; Doc. 138-3 at 29–30; Doc. 138-4 at 165; Def.'s Ex. 114. Cunningham, Donaldson, and Becker met with William Rush in his office for approximately an hour and a half. Doc. 138-5 at 68. While discussing the parts markup rate SFK was requesting, Rush told Isuzu that SDCL § 32-6B-61 did not require SFK to provide

Isuzu with repair orders to establish its markup rate. Doc. 138-1 at 79–82, 85; Doc. 138-5 at 74, 77; Pl.'s Ex. 9. Rush and the Isuzu representatives also discussed the training of SFK's parts personnel and its service technicians. Doc. 138-1 at 67–69, 119, 160.

After the meeting concluded, Wersal gave the Isuzu representatives a document listing four different markup rates that Black Hills Truck and Trailer used for Isuzu parts. Doc. 138-1 at 154; Doc. 138-3 at 43, 50–51; Doc. 138-4 at 202; Doc. 138-5 at 74, 120; Def.'s Ex. 222. Wersal later emailed Cunningham that SFK's standard markup rate for Isuzu parts was 58%. Def.'s Ex. 223; Doc. 138-3 at 44. Wersal attached a document listing four different markup rates that SFK used for Isuzu Parts. Doc. 138-3 at 49–51; Def.'s Ex. 223. Cunningham replied that she would forward the information to Isuzu's corporate office and would contact Wersal if she had any questions. Def.'s Ex. 115; Doc. 138-4 at 203.

The day after the meeting with Isuzu representatives, Rush sent Mills a memo saying that the rejected warranty claims should be resubmitted with an explanation of the requested OLH. Pl.'s Ex. 8; Doc. 138-2 at 193. That same day, Donaldson emailed Rush requesting the South Dakota statute saying that said SFK did not have to provide repair orders to establish its parts markup rate. Def.'s Ex. 9; Doc. 138-1 at 85. Rush emailed the text of SDCL § 32-6B-61 to Donaldson, who then forwarded Rush's email to Paul Hirose, an in-house attorney for Isuzu. Pl.'s Ex. 9; Doc. 138-5 at 77–78. On May 15, 2014, Donaldson forwarded Rush an email from Hirose saying that Isuzu was requesting one hundred consecutive repair orders to calculate SFK's parts markup rate. Pl.'s Ex. 9; Doc. 138-1 at 86–87. Hirose asserted that providing 100 repair orders was not "unduly burdensome" under SDCL § 32-6B-61 because the repair orders already existed and should not be difficult to print or download. Def.'s Ex. 9; Doc. 138-1 at 86–

87. Rush did not respond to Donaldson about the forwarded email from Hirose. Doc. 138-5 at 80.

Later in May 2014, Cunningham sent a mass email to SFK and other vehicle dealers advising that Isuzu had added more training classes and that the dealers' franchise agreements required them to have two fully-trained Isuzu technicians. Pl.'s Ex. 20; Doc. 138-5 at 10.

In mid-June 2014, Donaldson sent Rush an email listing the warranty claims Isuzu had yet to pay and stating that the main problem with these claims was a failure to adequately explain the requests for OLH. Pl.'s Ex 10; Doc. 138-5 at 80. Rush did not respond to Donaldson's email. Doc. 138-5 at 82.

On July 10, 2014, Cunningham emailed Mills about SFK's warranty claim for a transmission replacement SFK had done on a Fed Ex truck back in April. Doc. 138-4 at 174–76; Def.'s Ex. 176; Pl.'s Ex. 61. Cunningham asked Mills to reduce the amount of OLH he was requesting for the transmission replacement, but Mills replied that he did not agree with the proposed reduction. Def.'s Ex. 176; Doc. 138-4 at 174. Cunningham and Mills also exchanged emails in July concerning the training of SFK's technicians. Def.'s Ex. 247; Doc. 138-4 at 226–27. Mills questioned the wisdom of requiring SFK to have two technicians certified on Isuzu vehicles when SFK did not have enough business from Isuzu to keep even one certified technician busy. Def.'s Ex. 247. Cunningham explained that she wanted SFK to have two fully-certified technicians so that there would be no gaps in service if an Isuzu-trained technician went on vacation or left the dealership. Def.'s Ex. 247. At trial, however, Cunningham testified that there was a time in 2014 when none of the twenty to twenty-five Isuzu dealers she supervised had two fully-trained Isuzu technicians. Doc. 138-4 at 241–244; Pl.'s Ex. 36. She also admitted

that she did not know how many fully-trained technicians the franchise agreement required SFK to have. Doc. 138-3 at 99; Doc. 138-5 at 10.

On July 29, 2014, Mills submitted a warranty claim to Isuzu that requested 53.1 hours of OLH. Doc. 138-2 at 120–21, 182, 197; Doc. 138-4 at 183–84, 233; Def.'s Ex. 206. Isuzu responded on ICS that the claim was excessive, but did not specifically mention that Mills's claim was requesting 53.1 hours of OLH. Def.'s Ex. 206; Doc. 138-2 at 121, 197. Around that same time, Mills emailed Cunningham asking her why SFK's parts markup rate had not been changed to 58%. Def.'s Ex. 227. Cunningham forwarded Mills the email from Hirose asking for 100 consecutive repair orders and told Mills that Isuzu had yet to receive the requested documentation. Def.'s Ex. 227; Doc. 138-4 at 206.

Mills and Cunningham continued to exchange emails concerning the April 2014 Fed Ex warranty claim until August 8, 2014, when Cunningham wrote the following message to Mills in ICS: "YOU HAVE FAILED TO SUPPORT DOCUMENTATION FOR EXCESSIVE OLH. CLAIM DENIED. RESUBMIT FOR REASONABLE OLH."[2] Pl.'s Ex. 61; Doc. 138-4 at 177; Doc. 138-5 at 23. Rush testified at trial that because of other communications Isuzu had sent SFK, he believed that a denied claim could not be resubmitted. Doc. 138-1 at 96.

On August 11, 2014, Michael Rossetti, the director of field operations for Isuzu, sent Rush a letter expressing concern about the warranty claims Mills had been submitting. Doc. 138-1 at 89; Pl.'s Ex. 11. Rossetti provided Rush with examples of his concerns, including Mills's failure to submit 100 consecutive repair orders to support SFK's claim for a 58% markup rate on Isuzu parts, his July 29, 2014 warranty claim for 53.1 hours of OLH for a job with a standard repair time of 1.1 hours, and his claim for OLH on the April 2014 Fed Ex truck

---

[2]All communications in ICS are capitalized.

transmission replacement. Pl.'s Ex. 11. Rossetti wrote that although Isuzu was denying the claim for OLH on the Fed Ex transmission because it was incorrect and unsupported by an explanation, Isuzu would reimburse SFK for a reduced amount of OLH if Mills supplied the appropriate information. Pl.'s Ex. 11. Rush forwarded Rossetti's letter to Mills rather than responding himself. Doc. 138-1 at 93; Doc. 138-2 at 42–43; Doc. 138-5 at 177.

By September 3, 2014, Mills had corrected the July 29, 2014 warranty claim so that it now requested 5.3 hours of OLH rather than 53.1. Pl.'s Ex. 60; Doc. 138-4 at 236–38. SFK's entry of 53.1 hours resulted from SFK trying to enter 5.31 hours into Isuzu's ICS system when that system accepted only one digit after the decimal and auto-corrected the 5.31 entry to 53.1. Doc. 138-1 at 109–112; Doc. 138-2 at 120, 182. In a September 9, 2014 email to Donaldson, Cunningham wrote that she didn't think the OLH request of 5.3 hours for this warranty claim "[was] too bad." Pl.'s Ex. 40; Doc. 138-4 at 238–40.

Isuzu expected SFK to bill repairs covered by Isuzu warranty to Isuzu and not to the customer. SFK followed this practice, although its customer agreements contained language entitling SFK to bill the customer. Doc. 138-1 at 99, 102. In mid-September 2014, after Isuzu had not paid SFK for its April 2014 warranty claim on replacing a Fed Ex transmission, SFK sent a bill for $11,714.87 to Fed Ex stating that Fed Ex's warranty claim had been denied. Def.'s Exs. 181, 202; Doc. 138-2 at 52–53. Fed Ex is one of the largest customers of Isuzu trucks in the United States. Doc. 138-6 at 135. Fed Ex reported to Isuzu being billed directly for the transmission replacement. Def.'s Ex. 181. Rush explained at trial that Isuzu's refusal to pay the warranty claim prompted SFK to bill Fed Ex directly for unpaid or underpaid warranty work under SFK's customer agreement with Fed Ex. Doc. 138-1 at 99, 102. Rossetti sent Rush an email on October 8, 2014, stating that SFK had neither responded to his August 11 letter nor

resubmitted the warranty claims discussed in that letter. Pl.'s Ex. 14. Rossetti further asserted that SFK had violated the franchise agreement by billing Fed Ex for the transmission replacement and that Isuzu had declined to pay for this work because SFK had refused to document its request for OLH. Pl.'s Ex. 14. Rossetti concluded the email by stating "As these matters are urgent and serious, would you please let me know when you will be available this week for a telephone call?" Pl.'s Ex. 14. Rush never responded to Rossetti. Doc. 138-2 at 46–47; Doc. 138-5 at 178–79.

In the meantime, Mills emailed Cunningham saying that South Dakota law did not require SFK to submit 100 consecutive repair orders to establish its parts markup rate. Pl.'s Ex. 15. Mills also wrote that he would resubmit a particular warranty claim but that the claim would become the customer's responsibility if Isuzu did not pay. Pl.'s Ex. 15. Cunningham forwarded Mills's email to Rossetti, who emailed Mills and Rush on October 10, 2014. Pl.'s Ex. 15. Rossetti wrote that the franchise agreement required SFK to perform warranty work for Isuzu customers free of charge to the customers, and that SFK had failed to properly document its warranty claims. Pl.'s Ex. 15. He also wrote that until "Mr. Rush and Isuzu discuss these violations of your Isuzu dealer agreement and your mistreatment of Isuzu customers, all future communications must be with Mr. Rush." Pl's Ex. 15. Rush did not respond to this email. Doc. 138-2 at 51–52; Doc. 138-5 at 180.

On October 16, 2014, Edwin Robinson, manager of dealer development for Isuzu, sent Cunningham and Donaldson an email asking them to read a draft of a termination letter Isuzu planned on sending SFK and then tell him whether they had any issues or concerns with it. Pl.'s Ex. 75; Doc. 138-4 at 240–41. Cunningham replied that the draft letter was "[n]ice" and that her

only concern was that the letter mistakenly referred to Mills as SFK's service manager. Pl.'s Ex. 75; Doc. 138-4 at 241.

On October 17, 2014, Isuzu sent Rush a letter stating that it intended to terminate the franchise agreement effective January 23, 2015, claiming that SFK had violated the agreement as well as SDCL § 32-6B-45. Doc. 138-1 at 100; Pl.'s Ex. 16. Under § 32-6B-45, a franchisor cannot terminate a franchise agreement "without good cause." SDCL § 32-6B-45. Good cause is defined as "failure by a vehicle dealer to substantially comply with essential and reasonable requirements imposed upon the vehicle dealer by the vehicle dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated vehicle dealers by their terms." Id. Section 32-6B-45 provides that good cause for termination also exists if a dealer engages in the conduct enumerated in subsections (1) through (8) of the statute. Id. When a franchisor terminates a franchise agreement, it must comply with § 32-6B-45's notice and cure provision, which requires the franchisor to "provide a vehicle dealer at least ninety days prior written notice of termination." Id. This notice must "state all reasons constituting good cause for the action and shall provide that the dealer has sixty days in which to cure any claimed deficiency. If the deficiency is rectified within sixty days, the notice is void." Id. The notice and cure provision does not apply if the vehicle dealer is terminated for any of the reasons listed in subsections (1) through (7) of § 32-6B-45. Id. Isuzu's letter did not satisfy the notice and cure provision of § 32-6B-45.

Isuzu claimed in the October 2014 termination letter that SFK violated § 32-6B-45(7), which states that good cause for termination exists if the vehicle "dealer has engaged in conduct which is injurious or detrimental to the dealer's customers or to the public welfare." SDCL § 32-6B-45(7); Pl.'s Ex. 16. Isuzu stated that SFK had violated § 32-6B-45(7) by submitting "hyper-

12

inflated warranty reimbursement requests," including Mills's request for "more than *50 times* the

standard labor hours"[3] for a particular repair; billing Isuzu customers for warranty repairs; failing

to "actively and effectively" promote the sale of Isuzu trucks; failing to have an adequate

inventory of Isuzu trucks; not having any fully trained Isuzu service technicians; and not having

any staff fully trained in Isuzu parts. Pl.'s Ex. 16. Isuzu asserted that these actions also violated

the franchise agreement.[4] Pl.'s Ex. 16. Isuzu concluded the letter by stating "[w]hile you have

indicated no interest in resolving this matter or complying with the Agreement, should you now

desire to do so, please contact Mr. Edwin Robinson." Pl.'s Ex. 16. Isuzu's letter, however, did

not follow the procedure set forth in Article V.A.3. of the franchise agreement for termination for

a failure of performance. Doc. 47-6 at 47; Pl.'s Ex. 4. The letter did not give SFK sixty days to

cure any claimed deficiency and did not mention the review process described in Article V.A.3.

at all. Shaun Skinner, Isuzu's vice president and general manager, signed the letter. Pl.'s Ex. 16.

At trial, Skinner testified that he signed the termination letter after Robinson drafted it.

Doc. 138-6 at 133, 138. He explained that the key factors causing Isuzu to send the termination

letter were SFK billing Fed Ex for warranty work and its refusal to communicate with Isuzu.

Doc. 138-6 at 133–34, 143–44. Robinson testified that despite drafting the letter, he had never

investigated whether SFK had enough work to keep one technician busy working on Isuzu

products, never investigated the circumstances surrounding SFK's claim for 53.1 hours in OLH

on one repair (which had been corrected to 5.3 hours of OLH by the time of the termination

---

[3]This is a reference to the 53.1 OLH claim entered by accident in the ICS system, which by this time had been corrected to 5.31.
[4]The letter also states that SFK violated the franchise agreement by submitting false or fraudulent applications for warranty repairs. The letter is unclear on whether Isuzu was alleging that the submission of false or fraudulent applications violated § 32-6B-45(7). At the point the letter asserts false or fraudulent applications, the letter had already alleged that SFK violated § 32-6B-45(7) by submitting hyper-inflated claims.

letter), and never asked how many years of experience SFK's parts managers had working with Isuzu parts. Doc. 138-3 at 71, 75–76. When asked during his deposition whether the October 2014 termination letter provided SFK with a sixty-day cure period, Robinson testified that the cure period had started with Rossetti's August 2014 letter. Doc. 138-3 at 77–78. At trial, however, Robinson testified that Isuzu had determined that a cure period was unnecessary under SDCL § 32-6B-45 and the franchise agreement. Doc. 138-5 at 216, 235, 238. Robinson said that he had reviewed South Dakota law to ensure that the termination was proper. Doc. 138-6 at 30.

Many of the reasons Isuzu gave for terminating SFK came as a surprise to Rush. He testified that SFK generally scored highly on customer satisfaction surveys Isuzu sent out to SFK's customers. Doc. 138-1 at 59–60. He also explained that Isuzu rarely complained about SFK's performance under the franchise agreement. Doc. 138-1 at 61–66. Indeed, Rush said that the termination letter was the first time Isuzu complained to him that SFK's truck sales or truck inventory was inadequate, and that the May 2014 meeting was the first time Isuzu raised the training of SFK's personnel. Doc. 138-1 at 65–66, 104, 126. According to Rush, Cunningham discussed the training for SFK's technicians at the May 2014 meeting, and while Isuzu wanted SFK to have two fully trained technicians, Rush and the Isuzu representatives agreed for SFK to have one. Doc. 138-1 at 67–68, 119, 160. Rush had issued an internal memo recording his understanding to that effect. Doc. 138-1 at 68–69. Rush testified that eight of SFK's technicians had completed at least some of Isuzu's online training modules. Doc. 138-6 at 179–80.

Rush did not respond to the October 2014 termination letter, choosing to sue Isuzu instead. Doc. 138-2 at 54; Doc. 138-5 at 217; Doc. 138-5 at 226. SFK filed an amended complaint against Isuzu in November 2014 asserting eight causes of action. Doc. 47-6. The first

cause of action alleged that Isuzu violated SDCL § 32-6B-45 by terminating the franchise agreement without good cause; the second and third causes of action sought declaratory judgments that Isuzu violated SDCL §§ 32-6B-58 and 32-6B-61 by underpaying SFK for warranty parts and warranty service work; the fourth cause of action alleged that Isuzu breached the duty of good faith and fair dealing; the fifth cause of action alleged that Isuzu intentionally interfered with SFK's business relationships; the sixth cause of action alleged that Isuzu defamed SFK; the seventh cause of action sought a preliminary injunction to maintain the status quo; and the eighth cause of action alleged that Isuzu breached the franchise agreement in how it terminated the agreement. Doc. 47-6.

On January 12, 2015, after service of the amended complaint on Isuzu, Robinson sent Rush a letter concerning the October 2014 termination letter. Pl.'s Ex. 18. Robinson maintained that the termination letter had provided SFK with ninety days' notice of the termination, a cure period in excess of sixty days, and "an invitation to contact [Isuzu] if you had any interest in resolving the bases for termination." Pl.'s Ex. 18. Robinson's letter stated that South Dakota law did not require Isuzu to provide SFK with an opportunity to cure given the reasons for the termination, but that Isuzu was nevertheless "willing to consider providing" SFK with an additional period to cure the breaches listed in the October 2014 termination letter. Pl.'s Ex. 18. "If you have any interest in an additional opportunity to cure," Robinson wrote, "please notify me in writing by the end of the day on Wednesday, January 14, 2015." Pl.'s Ex. 18. Rush did not respond to the letter. Doc. 138-2 at 55; Doc. 138-5 at 238–39. SFK continued to perform some service work on Isuzu vehicles around this time, including replacing an engine in an Isuzu truck belonging to Fed Ex around January 2015. Doc. 138-1 at 116–17. Despite submitting a

warranty claim for the Fed Ex engine replacement to Isuzu, SFK never received any payment for the engine or labor. Doc. 138-1 at 117.

Some of the claims in SFK's amended complaint did not make it to trial. The parties stipulated to dismissal of SFK's defamation claim, Doc. 36, SFK abandoned its request for a preliminary injunction, Doc. 74 at 107, and this Court granted Isuzu summary judgment on SFK's claim that Isuzu intentionally interfered with SFK's business relationships, Doc 73; Doc. 74 at 107. This left five claims, some of which were pleaded in a somewhat unclear manner. Although SFK asked for declaratory judgments that Isuzu violated §§ 32-6B-58 and 32-6B-61 by underpaying SFK for warranty work and parts, it also asked for damages "in an amount to be determined at trial" for these alleged violations. Doc. 47-6 at 15–17. SFK's next claim, which was for breach of the implied covenant of good faith and fair dealing, alleged that Isuzu had breached the implied covenant "by its actions as set forth in detail herein." Doc. 47-6 at 17. Ultimately, this Court determined that the best reading of SFK's amended complaint was that the claim for breach of the implied covenant of good faith and fair dealing encompassed SFK's claims that Isuzu had damaged it by underpaying SFK for warranty service work and parts. Doc. 138-4 at 119, 126–27; Doc. 138-6 at 14, 210–11. The parties plainly understood that the alleged underpayment by Isuzu of SFK's warranty claims was a claim framed by the amended complaint.

At trial, SFK sought damages in the form of lost net profits from no longer being an Isuzu dealer, costs of Isuzu parts and inventory, signage expense, not collecting a 58% markup rate on Isuzu parts used for warranty work, not receiving payment for adequate time spent on warranty service work, and not getting paid at all for certain warranty work. Rush was SFK's witness on damages. Rush has an extensive business background, including working as a certified public

accountant and operating a business for decades that owns multiple vehicle dealerships in multiple states. Doc. 138-1 at 31–33. He began his damages testimony by calculating that in 2014, SFK made $159,626.14 in net income from its operation of the Sioux Falls Isuzu franchise based on new truck sales, parts sales, service, and shop supplies. Doc. 138-4 at 4–32. From there, Rush testified about three potential methods for projecting the damages SFK suffered by losing the Isuzu franchise.

First, Rush explained that in some circumstances, the appropriate value of a business can be calculated by taking the business's annual net income times a multiplier of four to six. Doc. 138-4 at 31–32. Rush testified that applying a multiplier of four to SFK's $159,626.14 in net income resulted in a figure of $638,504.56, while applying multiplier of six resulted in a figure of $957,756.84. Doc. 138-4 at 32. Rush believed, however, that although this multiplier method was a proper way to evaluate SFK's loss of the Isuzu franchise, it should not be used in this case because it failed to take into account the growth rate SFK had been able to achieve. Doc. 138-4 at 32–33.

Next, Rush testified that another potentially valid method for calculating SFK's damages was to multiply the net income in 2014 by an annual growth rate equal to the inflation rate of 3% over a ten-year period. Doc. 138-4 at 35–36. Rush said that Isuzu was SFK's "top performing" product line "in terms of growth rate percentage" and opined that SFK's profits on Isuzu business would have at least matched a 3% inflation rate over the next ten years. Doc. 138-4 at 35. He projected SFK's damages for loss of the Isuzu franchise under this method as $1,596,261. Doc. 138-4 at 36. But Rush believed that this second method was also deficient because the 3% growth rate was too low and the ten-year period was too short. Doc. 138-4 at 37. Thus, he proposed a third method for calculating SFK's damages.

Under this third method, Rush projected SFK's damages using a fifteen-year period and various growth rates. Doc. 138-4 at 37–52. Rush testified that a fifteen-year period was appropriate because Isuzu has 81% of the market in North America for cab-over utility vehicles and therefore left SFK no alternative for that market but to sell an Isuzu line; Isuzu has "held the number one position" in America for over 29 years; and Isuzu is a "very solid company." Doc. 138-4 at 37. As for the projected growth rate on sales of Isuzu parts, Rush said that he applied a 17% rate during the first five years, a 10% rate during the next five years, and a 6% rate during the last five years. Doc. 138-4 at 43–47, 88. In support of these figures, Rush testified that SFK had experienced a 17% compound growth rate in Isuzu parts purchases between 2010 and 2014. Doc. 138-4 at 43; see also Doc. 138-1 at 46–47. He also discussed an email from Isuzu, introduced as Plaintiff's Exhibit 3, stating that SFK had purchased $101,187 in parts in 2013, and that they should strive to purchase $132,758 in parts in 2014. Doc. 138-4 at 41–42. In regard to the growth rate for SFK's Isuzu truck sales, Rush said that he applied a 9.5% growth rate for the first five years but eventually dropped this rate to 4.2% in the fifteenth year. Doc. 138-4 at 44, 96–97. According to Rush, this third method for calculating SFK's damages put SFK's lost future profits from termination of the Isuzu franchise at $3,050,231. Doc. 138-4 at 51.[5] He testified that to arrive at this amount, he had made certain deductions for costs and had applied a discount rate to reduce the amount to present value. Doc. 138-4 at 49–50. Finally, Rush testified on rebuttal that SFK had 15 unpaid claims for warranty work on Isuzu trucks, and that the "undisputed" amount Isuzu owed for these claims was $76,000. Doc. 138-6 at 178.

---

[5]Rush also testified that applying his growth rates for a five-year period would yield a $1,026,609 damage calculation and applying the rates for ten years would yield a $2,085,816 damage calculation. Doc. 138-4 at 51.

David Hall, Isuzu's expert, testified that Rush's damages calculations were flawed and excessive. He opined that the growth rates and profit margins Rush used were too high, while the discount rate was too low. Doc. 138-6 at 65–94. Hall also said that the fifteen-year period Rush used to calculate SFK's damages was unreasonable given Rush's testimony about the market for Isuzu trucks in Sioux Falls being flat, the contentious nature of the parties' relationship, and the fact that the franchise agreement allowed either party to terminate the agreement. Doc. 138-6 at 95–97.

This Court submitted four claims to the jury: the statutory wrongful termination claim (claim I), the breach of contract claim for wrongful termination (claim II), the claim that Isuzu breached the duty of good faith and fair dealing by refusing to pay SFK a 58% markup on parts and failing to pay for adequate hours on warranty work, in violation of §§ 32-6B-58 and 32-6B-61 (claim III), and a claim that Isuzu breached the duty of good faith and fair dealing by withholding payments for warranty service work that was allegedly undisputed (claim IV). Doc. 135. This Court did not submit the declaratory judgment claims to the jury,[6] choosing instead to decide those claims itself after the jury's verdict. Doc. 138-6 at 211.

The jury returned a mixed verdict. It found in SFK's favor on the statutory wrongful termination claim and awarded SFK $1,600,000 in damages. Doc. 135. The jury also found in SFK's favor on its claim that Isuzu breached the implied covenant of good faith and fair dealing by withholding payments for warranty service work that was undisputed, awarding SFK $76,000 in damages on this claim. Doc. 135. But the jury found in Isuzu's favor on the breach of contract claim, concluding that SFK had committed a failure of performance under the franchise agreement, and that while Isuzu had breached the agreement by failing to follow the termination

---

[6]There was substantial overlap between the declaratory judgment claims and what SFK argued to be breach of the implied covenant of good faith and fair dealing.

procedure, SFK would not have remedied its breach of the agreement within a reasonable time. Doc. 135. The jury found partially in SFK's favor and partially in Isuzu's favor on SFK's claim that Isuzu breached the covenant of good faith and fair dealing by violating §§ 32-6B-58 and 32-6B-61. Doc. 135. The jury concluded that SFK did not actually have a 58% markup rate on Isuzu parts as SFK had claimed, but that Isuzu had failed to pay SFK for time that was adequate for warranty service work and that Isuzu's failure to do so had prevented SFK from receiving the reasonably expected benefits of the franchise agreement. Doc. 135. Nevertheless, the jury did not award SFK any money under the paragraph of the verdict form asking what damages SFK suffered as a result of Isuzu's failure to pay adequate time for warranty work. Doc. 135. The jury's award of $76,000 to SFK on unpaid warranty work evidently included the service time that was at issue in SFK's §§ 32-6B-58 and 32-6B-61 good faith claim. Doc. 138-7 at 81–83. This Court addressed this obvious rationale explaining the jury's treatment of the warranty damages claims. SFK's counsel agreed with the Court, saying that he did not think the verdict was inconsistent, but Isuzu's counsel was cagier in responding "I don't think I could say one way or another." Doc. 138-7 at 82.

Thereafter, this Court entered an interim judgment on the jury's verdict. Doc. 137. As to SFK's declaratory judgment claims, this Court concluded that Isuzu did not violate §§ 32-6B-58 and 32-6B-61 by failing to pay a 58% markup rate and that any further ruling on the declaratory judgment claims was rendered moot by the jury's verdict on the claim for breach of the implied covenant of good faith and fair dealing. Doc. 137.

## II.     Motion for New Trial

The standard for granting a new trial under Rule 59 is different from the standard for granting judgment as a matter of law. White v. Pence, 961 F.2d 776, 779–82 (8th Cir. 1992).

The governing question under Rule 59 is whether a new trial is required to avoid a miscarriage of justice. Greaser v. Mo. Dep't of Corr., 145 F.3d 979, 983 (8th Cir. 1998). Grounds for granting a new trial include a verdict that is against the weight of the evidence, an excessive damage award, and erroneous jury instructions or evidentiary rulings. Children's Broad. Corp. v. Walt Disney Co., 245 F.3d 1008, 1017 (8th Cir. 2001). "In determining whether a verdict is against the weight of the evidence, the trial court can rely on its own reading of the evidence—it can 'weigh the evidence, disbelieve witnesses, and grant a new trial even where there is substantial evidence to sustain the verdict.'" White, 961 F.2d at 780 (quoting Ryan v. McDonough Power Equip., 734 F.2d 385, 387 (8th Cir. 1984)). However, district courts may not "reweigh the evidence and set aside the jury verdict merely because the jury could have drawn different inferences or conclusions or because judges feel that other results are more reasonable." Id. (quoting Fireman's Fund Ins. Co. v. Aalco Wrecking Co., 466 F.2d 179, 186 (8th Cir. 1972)). Erroneous evidentiary rulings do not justify a new trial "unless [the wrongful admission or exclusion of] the evidence was so prejudicial that a new trial would likely produce a different result." Diesel Mach., Inc. v. B.R. Lee Indus., Inc., 418 F.3d 820, 833 (8th Cir. 2005) (quoting Harrison v. Purdy Bros. Trucking Co., 312 F.3d 346, 351 (8th Cir. 2002)). Similarly, courts will not grant a new trial based on erroneous jury instructions "unless the alleged error was prejudicial." Hallmark Cards, Inc. v. Murley, 703 F.3d 456, 460 (8th Cir. 2013). A new trial is warranted "only 'if the error misled the jury or had a probable effect on its verdict.'" Bamford, Inc. v. Regent Ins. Co., 822 F.3d 403, 410 (8th Cir. 2016) (quoting Acuity v. Johnson, 776 F.3d 588, 596 (8th Cir. 2015)).

Isuzu argues that it is entitled to a new trial based on the failure to assign the burden of proof to SFK on its § 32-6B-45 claim; erroneous evidentiary rulings; SFK being allowed to

maintain its declaratory judgment claims; the submission to the jury of claims for breach of the implied covenant of good faith and fair dealing; confusing jury instructions and verdict form; inconsistencies in the verdict; and Rush being allowed to testify about damages.

### A. Burden of Proof Issue on § 32-6B-45 Claim

Isuzu argues that a new trial is necessary because this Court failed to instruct the jury that SFK bore the burden of proving[7] that Isuzu lacked good cause to terminate SFK under § 32-6B-45. In the past, § 32-6B-45 required the franchisor to establish cause for termination in a hearing before a South Dakota agency. See SDCL § 32-6B-45 (pre March 2010 version) ("No franchisor may terminate or refuse to continue any franchise unless the franchisor has first established in a hearing held under the provisions of chapter 1-26, that: (1) the franchisor has cause for termination or noncontinuance . . . ."); see also In re Groseth Int'l, Inc., 442 N.W.2d 229, 232 (S.D. 1989) (applying Chapter 32-6A, which was later repealed and replaced by Chapter 32-6B, and stating that "[a] franchisor seeking to terminate a franchise under the provisions of SDCL ch. 32-6A must show that it has good cause for termination"). In 2010, the South Dakota Legislature amended § 32-6B-45 to its current form by, among other things, removing the language that required the franchisor to establish good cause for termination before a South Dakota agency, but leaving in the requirement that a franchisor cannot terminate a franchise agreement "without good cause." See SDCL § 32-6B-45. The current version of § 32-6B-45 is silent on whether the franchisor bears the burden of proving "good cause" for termination or whether the franchisee bears the burden of proving an absence of good cause, and there are no

---

[7]The phrase "burden of proof" encompasses two separate burdens: "the 'burden of persuasion,' *i.e.*, which party loses if the evidence is closely balanced, and the 'burden of production,' *i.e.*, which party bears the obligation to come forward with the evidence at different points in the proceeding." Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56 (2005). Isuzu's argument concerns the burden of persuasion.

South Dakota cases discussing the burden under the current version. Before and during trial, Isuzu argued that SFK should bear the burden under § 32-6B-45 given the 2010 amendments to the statute and the general rule that plaintiffs bear the risk of failing to prove their claims. SFK disagreed, arguing that Minnesota Supply Co. v. Raymond Corp., 472 F.3d 524 (8th Cir. 2006)—a case where the Eighth Circuit considered but did not analyze the language of a Minnesota statute similar to § 32-6B-45—made clear that Isuzu should bear the burden of proving that it had good cause to terminate the franchise agreement.

This Court recognized when settling final instructions that there was no clear answer as to who bears the burden of proof under § 32-6B-45. Doc. 138-6 at 8–9, 223–27. Rather than instructing on the burden of proof under § 32-6B-45 and risking retrial of a long and costly case, this Court decided to instruct the jury in a way where everyone would know whether the burden of proof affected the jury's decision. Doc. 138-6 at 8–9, 224–27. If the jury indicated that the burden of proof would affect its analysis, this Court would decide the issue and instruct the jury accordingly. Doc. 138-6 at 8–9.

South Dakota's pattern instruction on the burden of proof and the preponderance of the evidence, which this Court gave the jury, explains how the burden of proof should factor into the jury's analysis: "In the event that the evidence is evenly balanced so that you are unable to say that the evidence on either side of an issue has the greater convincing force, then your finding upon the issue must be against the party who has the burden of proving it." Doc. 134 at 9; S.D. Civ. Pattern Jury Instrs. § 1-60-10. This instruction is consistent with case law explaining that the principal significance of the burden of proof is that it acts as a tie-breaker when the evidence

is in equipoise.[8] Blodgett v. Comm'r of Internal Revenue., 394 F.3d 1030, 1039 (8th Cir. 2005); Jones v. United States, 207 F.3d 508, 510 (8th Cir. 2000); Cigaran v. Heston, 159 F.3d 355, 357 (8th Cir. 1998); Bristow v. Drake St. Inc., 41 F.3d 345, 353 (7th Cir. 1994); Gordan v. St. Mary's Healthcare Ctr., 617 N.W.2d 151, 157–58 (S.D. 2000). When the evidence is not evenly balanced, i.e., the greater convincing force of the evidence favors one party over the other, the burden of proof plays no role in the trier of fact's decision. Blodgett, 394 F.3d at 1039 ("In a situation in which both parties have satisfied their burden of production by offering some evidence, then the party supported by the weight of the evidence will prevail regardless of which party bore the burden of persuasion, proof or preponderance. Therefore, a shift in the burden of preponderance has real significance only in the rare event of an evidentiary tie." (internal citation omitted)); Jones, 207 F.3d at 510 ("[T]he burden of proof in a civil case serves to determine who prevails only if the evidence is in equipoise. The rule simply decides, in other words, who wins if there is a tie."); Cigaran, 159 F.3d at 357 ("The shifting of an evidentiary burden of preponderance is of practical consequence only in the rare event of an evidentiary tie: If the

---

[8]The burden of proof is also relevant when there is no evidence on an issue or a party has not carried its burden of producing evidence. Burden of Proof, Black's Law Dictionary (10th ed. 2014). Isuzu asserts in its reply brief that SFK failed to offer any evidence that 1) Fed Ex was not injured when it received a bill for the transmission; and 2) that SFK substantially complied with the essential and reasonable requirements of the franchise agreement "if the requirements are not different from those requirements imposed on other similarly situated vehicle dealers by their terms." Isuzu is incorrect. Even if SFK had some burden, as Isuzu asserts, to prove a lack of injury to Fed Ex, SFK's evidence established that SFK fixed the transmission correctly and returned the truck to Fed Ex, Doc. 138-1 at 99, that Fed Ex never actually paid the bill for the transmission, Doc. 138-6 at 159, that Fed Ex had SFK do work on an Isuzu truck even after SFK sent Fed Ex the transmission bill, Doc. 138-1 at 116–17; Doc. 138-4 at 59–60, and that Isuzu gave SFK an opportunity in January 2015 to continue operating an Isuzu franchise despite SFK's alleged injurious conduct to Fed Ex, one of Isuzu's most important customers, Pl.'s Ex. 18. As for substantially complying with the franchise agreement, SFK offered evidence that it complied with the terms of the agreement, Doc. 138-1 at 60, 102–03, 105, 118–19, 121–22, 126; 138-3 at 16–18, 20, 40–41, that Isuzu had complained very little about SFK's alleged failure to do so, Doc. 138-1 at 62–70, 103–05, and that Isuzu had not terminated other dealerships for failings it listed in the termination letter, Doc. 138-5 at 15–17, 205–06.

evidence that the parties present balances out perfectly, the party bearing the burden loses."); Bristow, 41 F.3d at 353 ("Burdens of persuasion affect the outcomes only of cases in which the trier of fact thinks the plaintiff's and the defendant's positions equiprobable. Burdens of persuasion are, in other words, tie-breakers. If the trier of fact, having heard all the evidence, comes to a definite conclusion, he has no occasion to invoke a burden of persuasion.").

To determine whether the jury found that the evidence was equally balanced, and thus whether the burden of proof would make a difference in the jury's decision, this Court submitted the following verdict form on SFK's statutory wrongful termination claim:

> 1.  Did Sioux Falls Kenworth engage in conduct that was injurious or detrimental to Sioux Falls Kenworth's customers or the public welfare? (check one box)
>
> ☐ Yes
>
> ☐ No
>
> ☐ Evidence is in balance at exactly 50%–50%
>
> If your answer to this question is "yes," your verdict on the wrongful termination claim must be for Isuzu. If your answer is "no," or you are unable to agree on a verdict as to Question No. 1, proceed to Questions No. 2 and 3. You are to use the preponderance of the evidence standard, also known as the greater weight of the evidence standard, in answering these questions. If you find that the evidence is in balance, such that the weight of the evidence is exactly 50%–50%, then so indicate on the verdict form and this Court will provide you further instructions. Rarely is evidence exactly 50%–50%, so you should endeavor to decide this question using the preponderance of the evidence standard.
>
> 2.  Did Sioux Falls Kenworth fail to substantially comply with the essential and reasonable requirements imposed upon Sioux Falls Kenworth by the franchise agreement, if the requirements are not different from those requirements imposed on other similarly situated vehicle dealers by their terms? (check one box)
>
> ☐ Yes

☐ No

☐ Evidence is in balance at exactly 50%–50%

You are to use the preponderance of the evidence standard, also known as the greater weight of the evidence standard, in answering this question. If you find that the evidence is in balance, such that the weight of the evidence is exactly 50%–50%, then so indicate on the verdict form and this Court will provide you further instructions. If you answered Question No. 2 "yes," then in answering Question No. 3 and in any determination of damages, you may consider whether it would have made any difference if Isuzu had given a notice and opportunity to cure; that is, whether Sioux Falls Kenworth would have cured any substantial failure to comply with the essential and reasonable requirements of the franchise agreement. Regardless of how you answer Question No. 2, you are to consider Question No. 3.

3.    Did Isuzu's violation of SDCL § 32-6B-45 legally cause damages to Sioux Falls Kenworth? (check one box)

☐ Yes

☐ No

If you reach this question and your answer to this question is "yes," your verdict on the wrongful termination claim must be for Sioux Falls Kenworth. You are then to consider the amount of damages that Sioux Falls Kenworth has proven by a preponderance of the evidence was legally caused by a violation of SDCL § 32-6B-45. If your answer is "no," your verdict on the wrongful termination claim must be for Isuzu. On this question, Sioux Falls Kenworth has the burden of proof by a preponderance of the evidence, which means by the greater weight of the evidence.

Doc. 135 at 1–2.[9] The jury answered "No" to questions 1 and 2 but "Yes" to question 3. Doc.

135 at 1–2. Because the jury determined that the preponderance of the evidence favored SFK on

---

[9] When reading the verdict form as it related to SFK's § 32-6B-45 claim, this Court reiterated "neither of these two parties bear [the preponderance of the evidence standard] at this point. If you check 50-50, the Court will give you further instructions." Doc. 138-7 at 66–67.

questions 1 and 2, it was unnecessary for this Court to instruct the jury on which party bore the burden of proof under § 32-6B-45.

Notwithstanding the jury's response to questions 1 and 2, Isuzu maintains that it is entitled to a new trial because the failure to instruct on the burden of proof is per se reversible error. Isuzu's argument is wrong. The harmless error rule applies to erroneous jury instructions, including instructions, or the lack thereof, on the burden of proof. Specialized Transp. of Tampa Bay, Inc. v. Nestle Waters N. Am., Inc., 356 F. App'x 221, 227–28 (11th Cir. 2009) (per curiam) (concluding that party was not prejudiced by jury instructions that were silent on the burden of proof); Beshears v. Asbill, 930 F.2d 1348, 1351–52 (8th Cir. 1991) (holding that the district court's instruction assigning the burden of proof to the wrong party was harmless error); Ray E. Friedman & Co. v. Jenkins, 738 F.2d 251, 254 (8th Cir. 1984) ("The harmless error rule applies to incorrect instructions regarding burden of proof."). The multiple cases Isuzu cites in its briefs are not to the contrary. Rather, these cases demonstrate that whether an erroneous instruction on the burden of proof prejudices a party depends on the facts of the particular case. For example, appellate courts have found prejudice when the district court's failure to instruct the jury on the burden of proof "may have affected the damages award," Jones v. Consol. Rail Corp., 800 F.2d 590, 594 (6th Cir. 1986); when the issue of liability was a "very close and difficult question" and the district court's instructions on the burden of proof "were at best ambiguous," Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc., 254 F.3d 706, 714 (8th Cir. 2001); when the district court's failure to instruct on the burden of proof "was too central to be harmless" and there was "no assurance that the jury applied" the appropriate burden, Deas v. PACCAR, Inc., 775 F.2d 1498, 1506 (11th Cir. 1985); when the district court gave a general instruction on the burden of proof but refused to instruct the jury that the counterclaimant had the

burden of proving that the plaintiff's agent had the authority to enter into a contract, Ralston Purina Co. v. Parsons Feed & Farm Supply, 364 F.2d 57, 61–62 (8th Cir. 1966); when the appellate court could not determine whether the district court's failure to instruct on the burden of proof made a difference in the jury's verdict, Carvalho v. Raybestos-Manhattan, Inc., 794 F.2d 454, 456–57 (9th Cir. 1986); and when the district court's failure to instruct that the defendant had to prove his affirmative defense "may well have affected the jury's" decision, Davis v. Lane, 814 F.2d 397, 401 (7th Cir. 1987). Similarly, appellate courts have found prejudice when the district court's erroneous instruction could potentially have allowed the jury to find in the defendants' favor even though the defendants failed to carry their burden, Kelly v. Armstrong, 141 F.3d 799, 802–03 (8th Cir. 1998), or when the facts were such that the appellate court could not tell whether a proper instruction on the burden of proof would "have altered the outcome in some substantial way," Sheppard Fed. Credit Union v. Palmer, 408 F.2d 1369, 1373 (5th Cir. 1969). The common thread in these cases is that the appellate court was unable to determine from the record whether the erroneous instructions on the burden of proof affected the jury's decision. Here, the instructions were designed to avoid possible reversible error by deciding an unsettled issue of South Dakota law on who had the burden of proof on a § 32-6B-45 claim; rather, the instructions told the jury that, if indeed it found the evidence to be in equipoise, to so indicate for the court (and in turn the appellate court) to know if who bore the burden of proof on the § 32-6B-45 claim mattered. Doc. 135 at 1–2. If the jury had checked the box that it found "Evidence is in balance at exactly 50%–50%" on either of the two fact issues where the burden of proof was unsettled under South Dakota law, then this Court would have instructed the jury on what would be a prediction of how the Supreme Court of South Dakota might decide the issue. The jury's verdict—that the evidence was not in equipoise but rather favored SFK by a

preponderance—made clear that instructing the jury that SFK bore the burden on the wrongful termination claim would not have altered the outcome.

Isuzu contends that regardless of who bore the burden of proof on the wrongful termination claim, this Court's failure to assign the burden caused Isuzu "irreparable prejudice." Doc. 171 at 13. Isuzu asserts that if it bore the burden to prove good cause to terminate (and this Court never instructed the jury that it did), Isuzu had the "right" to present a rebuttal case and to go first during voir dire, opening statements, the presentation of evidence, and closing arguments. Isuzu's argument again is wrong. Isuzu would not have received these benefits even if it bore the burden of proving good cause for termination under § 32-6B-45. SFK had the burden of proving all three other claims to the jury as well as all damages claims. This Court would not have realigned the parties or restructured the order of proof so that the party bearing the burden on part of one claim could go before the party bearing the burden on three other claims as well as on damages. See Anheuser-Busch, Inc. v. John Labatt Ltd., 89 F.3d 1339, 1344 (8th Cir. 1996) (holding that the district court did not abuse its discretion by denying defendant's motion to realign the parties when the defendant had the burden of proof on one of the plaintiff's three claims). Nor would this Court have granted the motion to bifurcate which Isuzu claims it would have filed if it thought that it bore the burden of proving good cause for termination. Rule 42(b) of the Federal Rules of Civil Procedure allows courts to order separate trials of claims "[f]or convenience, to avoid prejudice, or to expedite and economize." Fed. R. Civ. P. 42(b). There was substantial overlap between the evidence on the wrongful termination claim and the evidence on the three remaining claims. Bifurcating the statutory wrongful termination claim from the other claims would have wasted judicial resources and unnecessarily increased the cost of litigation.

Isuzu makes several alternative arguments for prejudice in not having the jury instructed as Isuzu wished. Isuzu claims that it might have argued the § 32-6B-45 claim differently to the jury, for instance, if the jury instructions had allocated the burden of the § 32-6B-45 claim to SFK. For the reasons already explained, the absence of a burden of proof instruction on the statutory wrongful termination claim did not prejudice Isuzu under the circumstances. Isuzu has not cited any cases suggesting that the inability to argue the burden of proof issue to the jury in a civil case is so prejudicial as to warrant a new trial. Isuzu's assertion that the failure to assign the burden of proof caused it prejudice is unconvincing.

Isuzu's last argument is that because the jury found in Isuzu's favor on the breach of contract claim, "there is strong reason to believe" that it would have found in Isuzu's favor on the statutory wrongful termination claim had the jury only been instructed that SFK bore the burden of proof on the § 32-6B-45 claim. But the jury's conclusion that the evidence favored SFK by a preponderance shows that instructing the jury that SFK bore the burden on the statutory wrongful termination claim would not have made any difference. And, as explained more fully in section II.F. of this opinion, the statutory wrongful termination claim and the breach of contract claim involved different elements and posed to the jury different questions. Given the evidence, it is not surprising that the jury found in SFK's favor on the statutory wrongful termination claim and in Isuzu's favor on the breach of contract claim. Nothing suggests that the jury's verdict was caused by the failure to assign the burden of proof on the statutory wrongful termination claim. Isuzu has failed to demonstrate that the instructions on the statutory wrongful termination claim were in any way wrong or caused it prejudice.

**B. Evidentiary Rulings**

Isuzu contends that this Court made two erroneous evidentiary rulings during the testimony of Edwin Robinson, Isuzu's manager of dealer development who drafted the termination letter that Shaun Skinner signed. First, Isuzu argues that this Court should have allowed Robinson to explain what he had been told about SFK's 53.1 OLH warranty reimbursement claim. On direct examination, Robinson testified that Isuzu's director of field operations, Michael Rossetti, was his source of information for the paragraph in the termination letter addressing the 53.1 OLH claim. Doc. 138-5 at 217; see also Doc. 138-5 at 210. Isuzu then asked Robinson about the facts surrounding the claim:

> Isuzu: To your understanding, what did the dealership [meaning SFK] do after it had made the 53.1 hour entry?
> SFK: Objection, lack of foundation.
> The Court: Sustained.
> Isuzu: Have you been informed about the circumstances surrounding the 53.1 hour entry?
> SFK: Objection, hearsay.
> The Court: Overruled. I think it's preliminary.
> Robinson: Yes, I have.
> Isuzu: Did that form the basis for the actions you took in this letter?
> Robinson: Yes, that's correct, yes.
> Isuzu: Okay. And what were you informed?
> SFK: Objection, hearsay.

Doc. 138-5 at 219–20. This Court called a sidebar after SFK's objection, during which Isuzu explained that it wanted to introduce Robinson's testimony concerning what he was told about the 53.1 OLH claim to show the effect this information had on him. Doc. 138-5 at 220. This Court sustained SFK's objection on hearsay grounds. Doc. 138-5 at 220–21. After all, Rossetti had testified separately, and Robinson never spoke with any representative of SFK. Doc. 138-3 at 76.

Isuzu argues in its motion for a new trial that Robinson's testimony was admissible for the non-hearsay purpose of showing why Robinson included information about the 53.1 OLH

claim in the termination notice. According to Isuzu, Robinson's testimony concerning what he was told about the 53.1 OLH claim by Rossetti would have shown the "thoughtful process through which Robinson decided to draft" the termination letter. Doc. 155 at 13. Isuzu speculates that the jury then might have decided the statutory wrongful termination claim in Isuzu's favor if it had heard more about how supposedly thorough Robinson had been with respect to the 53.1 OLH claim.

Any error in prohibiting Robinson from explaining what he remembered hearing from his co-employee Rossetti about the 53.1 OLH claim was not so prejudicial "that a new trial would likely produce a different result." Diesel Mach., Inc., 418 F.3d at 833 (quoting Harrison, 312 F.3d at 351). Although Isuzu complains that this Court's ruling prevented it from explaining the basis for the termination letter and the process by which Robinson drafted it, there was substantial testimony on these topics. Robinson testified that terminating a dealership is a lengthy process that involves gathering information from the Isuzu employees who work with the dealer, looking at whether the dealer is penetrating the market, and considering the quality of the dealer's service and customer care. Doc. 138-5 at 209–10. He described the decision to terminate SFK's franchise agreement as a collaborative effort and said that he had engaged in "many, many conversations" with his colleagues by the time he drafted the termination letter. Doc. 138-5 at 213–215. Robinson testified that he included the 53.1 OLH claim in the termination letter because it "was another example of the egregiousness of the behavior on the part of" SFK. Doc. 138-5 at 217. He explained that he gathered facts about SFK's warranty claims from Rossetti, Doc. 138-5 at 210, that Rossetti was his source of information for the 53.1 OLH claim, Doc. 138-5 at 217, and that he had reviewed Rossetti's August 11, 2014 letter discussing the 53.1 OLH claim, Doc. 138-5 at 221. Rossetti corroborated Robinson's testimony,

saying that he discussed SFK's termination with Robinson, Doc. 138-5 at 133; that he had provided Robinson information about SFK's parts and service, including the 53.1 OLH claim, Doc. 138-5 at 132, 202–03; and that he had discussed his August 11, 2014 letter with Robinson, Doc. 138-5 at 175. Also, the jury heard extensive testimony from Cunningham and Rossetti about Mills's submission of the 53.1 OLH claim and what happened thereafter. Doc. 138-4 at 182–89; Doc. 138-5 at 159–64. Under these circumstances, where the jury heard considerable evidence about Robinson's drafting of the termination letter, his source of information for the 53.1 OLH claim, and the facts surrounding the claim itself, Isuzu was not prejudiced by this Court's decision to prohibit Robinson from testifying about the details of what Rossetti (who separately testified on the subject to the jury) told Robinson about the 53.1 OLH claim.[10] Indeed, the critical issue under the statutory wrongful termination claim was not what others had told Robinson about the information in the termination letter, but rather whether Isuzu actually had good cause to terminate the franchise agreement.

Isuzu's second evidentiary argument is that this Court erred by overruling two of its objections when SFK asked Robinson whether having a certain number of trucks in inventory at SFK constituted an "imminent danger to the public." Doc. 138-6 at 39–40. Isuzu argues that these questions caused it prejudice because they misled the jury on the proper standard under § 32-6B-45. Isuzu's argument is unconvincing. This Court's jury instructions explained the proper standard for termination under § 32-6B-45, Doc. 134 at 10–11, and told the jury that

---

[10]Isuzu has given shifting explanations about what Robinson's testimony would have been had this Court not sustained SFK's hearsay objection. In its briefs, Isuzu says that Robinson would have explained why he drafted the termination letter. Doc. 171 at 16. At oral argument, however, Isuzu said that the testimony this Court prevented Robinson from giving was that Rossetti had given Robinson the information about the 53.1 OLH claim. Doc. 183 at 18–19. As explained above, Isuzu was allowed to introduce plenty of evidence that Rossetti was Robinson's source of information for the 53.1 OLH claim. Doc. 138-5 at 132–33, 175, 202–03, 210, 217, 221.

"[s]tatements, arguments, questions and comments by lawyers representing the parties in the case are not evidence," Doc. 134 at 5. Juries are presumed to follow the court's instructions, Weeks v. Angelone, 528 U.S. 225, 234 (2000), and Isuzu has offered nothing but speculation to rebut this presumption. Furthermore, Robinson's testimony undercuts Isuzu's assertion that SFK's questions were confusing to Robinson and the jury. On one of the occasions where SFK asked Robinson about an imminent danger to the public, Robinson replied that § 32-6B-45 refers to a detriment to the public rather than an imminent danger. Doc. 138-6 at 39. He also explained that Isuzu never alleged that SFK posed an imminent danger to the public. Doc. 138-6 at 39. Isuzu was not prejudiced by SFK asking about an imminent danger to the public.

### C. Declaratory Judgment Claims

Isuzu argues that this Court erred by "interweaving" the declaratory judgment claims into the claim for breach of the implied covenant of good faith and fair dealing. Doc. 155 at 14. According to Isuzu, this Court should instead have dismissed the declaratory judgment claims for lack of jurisdiction.

Isuzu's arguments about the declaratory judgment claims do not justify a new trial. The amended complaint can fairly be read as alleging that Isuzu breached the implied covenant of good faith and fair dealing by underpaying SFK for warranty parts and warranty service work, in violation of SDCL §§ 32-6B-58 and 32-6B-61, as well as failing to pay SFK at all for certain warranty work. See Doc. 47-6. After all, the amended complaint is replete with allegations about unpaid and underpaid warranty claims, the declaratory judgment claims both allege that Isuzu acted in bad faith by unjustifiably rejecting SFK's warranty claims,[11] and the claim for

---

[11]The declaratory judgment claims state that Isuzu violated SDCL §§ 32-6B-58 and 32-6B-61 in part by "[r]ejecting Plaintiff's warranty submissions based upon alleged insufficient

breach of good faith and fair dealing alleges that Isuzu breached the implied covenant "by its actions as set forth in detail herein." Doc. 47-6 at 15–17. Isuzu could not have been surprised that the issues surrounding the unpaid and underpaid warranty claims would be litigated at trial. Isuzu obviously was planning and ready to try these very issues to the jury.

Although the declaratory judgment claims were not submitted to the jury, Isuzu contends that the failure to dismiss these declaratory judgment claims caused it prejudice because it prevented Isuzu "from properly litigating the case." Isuzu has not given any explanation of how it would have tried the case differently had this Court dismissed the declaratory judgment claims, let alone explained how these different trial tactics would have had a probable effect on the jury's verdict. Indeed, based on the jury verdict, this Court ultimately chose not to award further relief under the declaratory judgment counts. There was absolutely no prejudice to Isuzu in how the Court handled the declaratory judgment counts.

## D. Claims III and IV, SFK's claims for Breach of the Implied Covenant of Good Faith and Fair Dealing

Isuzu makes several arguments in its motion for a new trial concerning claims III and IV. These arguments are addressed in the judgment as a matter of law section of this opinion because they are, at bottom, arguments that Isuzu won on claims III and IV.

### E. Instructions and Verdict Form

Isuzu argues that the jury instructions and verdict form were misleading because they used the term "undisputed" when instructing on claim IV, which was SFK's claim that Isuzu breached the implied covenant of good faith and fair dealing by not paying SFK at all for certain warranty work. Isuzu failed to preserve its argument about the term "undisputed" because it

---

documentation, and engaging in a pattern and practice of multiple rejections without basis and in bad faith."

never objected to the use of this term. <u>Lopez v. Tyson Foods, Inc.</u>, 690 F.3d 869, 875–76 (8th Cir. 2012) ("To preserve alleged errors in the jury instructions, 'a party must make a specific objection that distinctly states the matter objected to and the grounds for the objection.'" (quoting <u>Bauer v. Curators of the Univ. of Mo.</u>, 680 F.3d 1043, 1044–45 (8th Cir. 2012))); Doc. 138-6 at 14–27; 212, 232–34; Doc. 138-7 at 6–8, 57–59. In any event, use of the term "undisputed" did not prejudice Isuzu. The context of the trial made clear that "undisputed" as used in the jury instructions and verdict form referred to those portions of SFK's warranty claims that were not subject to a disagreement over OLH or a parts markup, yet remained unpaid. Doc. 135. The instructions did not tell the jury that the actual amounts SFK was requesting were undisputed.

### F. Inconsistencies in the Verdict

Isuzu argues that it was inconsistent for the jury to find, on the one hand, that SFK had committed a "failure of performance"[12] under the breach of contract claim, but then on the other hand, find under SFK's statutory wrongful termination claim that SFK did not "fail to substantially comply with the essential and reasonable requirements imposed upon [SFK] by the franchise agreement," provided that those requirements were "not different from those requirements imposed on other similarly situated vehicle dealers by their terms."[13]

Courts have a "duty to harmonize inconsistent verdicts, viewing the case in any reasonable way that makes the verdicts consistent." <u>Anheuser-Busch, Inc.</u>, 89 F.3d at 1347. It is more than reasonable to view the jury's verdict on claims I and II as consistent. Isuzu argued at trial that SFK failed to have adequately trained sales and service personnel and failed to carry sufficient inventory. Doc. 138-7 at 31–32, 40, 46–47. The franchise agreement required SFK to

---

[12]This term in the instructions came from the franchise agreement. Doc. 47-6 at 47; Pl.'s Ex. 4.
[13]This language in the instructions came from SDCL § 32-6B-45.

employ an adequate number of sales and service personnel and to send these employees to Isuzu training. Doc. 47-6 at 36, 40. The franchise agreement also required SFK to maintain an adequate inventory of Isuzu vehicles. Doc. 47-6 at 37. The jury could reasonably have found that although SFK committed a "failure of performance" by not having an adequate staff or inventory, the contractual provisions SFK violated were not "essential and reasonable" requirements of the franchise agreement. Indeed, Dawn Cunningham, Isuzu's regional manager assigned to supervise the relationship with SFK and other dealers, acknowledged that smaller Isuzu dealers customarily failed to meet Isuzu's expectations for the number of trained service technicians. Doc. 138-4 at 241–44; Pl.'s Ex. 36. Or the jury could have concluded that while SFK technically violated the franchise agreement, it still "substantially compl[ied]" with the agreement. Still another reasonable option is that the jury found that the contractual requirements Isuzu imposed on SFK were "different from those requirements imposed on other similarly situated dealers by their terms." After all, Rossetti admitted at trial that although there were other Isuzu dealerships that lacked fully-trained technicians, these dealerships were not going to be terminated for that reason. Doc. 138-5 at 205.

Isuzu also argues that because SFK's breach of contract "establishes a complete affirmative defense" on all contractual claims, including the good faith and fair dealing claims, it was inconsistent for the jury to find in SFK's favor on these claims. This argument fails for the reasons explained in section III.B. of this opinion.

### G. Rush's Damages Testimony

Isuzu argues that it is entitled to a new trial because while SFK offered William Rush (an owner of SFK's holding company and the person primarily responsible for SFK's operations) as a lay witness, he actually offered expert testimony on damages. Isuzu also argues that SFK

violated Federal Rule of Civil Procedure 26 by failing to timely disclose Rush as an expert on damages.

Federal Rule of Evidence 701 governs opinion testimony by lay witnesses while Rule 702 governs expert testimony. Rule 701 allows a witness who is not an expert to offer an opinion when it is: "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." The advisory committee notes to Rule 701 explain that a business owner or officer may "testify to the value or projected profits of the business, without [being qualified] as an accountant, appraiser, or similar expert" when that testimony is based on "the particularized knowledge that the witness has by virtue of his or her position in the business." Fed. R. Evid. 701 advisory committee note to 2000 amendments; see also Allied Sys. v. Teamsters Auto. Transp. Chauffeurs, Local 604, 304 F.3d 785, 792 (8th Cir. 2002).

Although Isuzu agrees that business owners can offer lay witness testimony about damages, it argues that Rush crossed the line into expert testimony because he engaged in complex data analysis and relied on sources outside his personal knowledge—such as Isuzu's annual sales report, IBISWorld reports, and portions of the report of Phillip Williams, the expert SFK retained—when selecting a 15-year damage period and calculating SFK's growth rate for the Isuzu franchise. As explained in section IV of this opinion, however, this Court is remitting the jury's $1,600,000 award on claim I to an amount that does not depend on Rush's complex data analysis, his testimony that SFK would have continued to operate the Isuzu franchise for years to come, and his use of growth rates. Thus, if there was any error in allowing Rush to testify about these issues, it ultimately does not harm Isuzu.

Isuzu argues that the late disclosure that Rush would testify about damages prejudiced Isuzu by creating a "massive distraction" during trial, but this argument does not justify a new trial. The trial began on October 25, 2016. Isuzu states that SFK waited until October 3, 2016, to inform Isuzu that Rush, rather than SFK's retained expert Williams, was going to testify about damages. Doc. 183 at 24. Isuzu had challenged whether Williams could testify to his disclosed damages calculation, so SFK's decision not to call Williams caused no prejudice to Isuzu. During a pretrial hearing on October 20, 2016, this Court heard argument concerning Rush's late-disclosed calculation of SFK's damages and ruled that Isuzu could depose Rush about his damages calculation. Docs. 122–23. Rather than deposing Rush during the four days before trial, Isuzu chose to depose him on the evenings of October 25 and 26, for a total of four-and-a-half hours. Docs. 126-1, 126-2; Doc. 183 at 27, 73. Rush testified later during the trial about his damages calculations, and Isuzu had the transcript of the depositions at hand to use in cross-examination. Docs. 126-1, 126-2. These mid-trial depositions of Rush should not have caused a "massive distraction" for Isuzu, who had four very capable attorneys representing it at trial along with additional support staff on site. Indeed, the mid-trial depositions were more disruptive to SFK, because it had just two attorneys and because Rush ended up testifying at trial during the day to issues other than damages and then sitting for a deposition at night. Isuzu's attorneys were well prepared to cross-examine Rush on damages, and Isuzu's damages expert was well prepared to address and critique Rush's calculations. Isuzu's motion for a new trial based on Rush's damages testimony is denied.

## III. Motion for Judgment as a Matter of Law

Rule 50(b) allows a party that previously moved for judgment as a matter of law to renew that motion after entry of final judgment. Judgment as a matter of law is proper "[i]f a party has

39

been fully heard on an issue during a jury trial and the court finds that a reasonable jury would not have a legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a)(1). In diversity cases such as this, a court considering a motion for judgment as a matter of law typically applies the sufficiency-of-the-evidence standard of the state in which it sits, at least where the state and federal standards are similar. Mich. Millers Mut. Ins. Co. v. Asoyia, Inc., 793 F.3d 872, 877–78 (8th Cir. 2015). The federal sufficiency-of-the-evidence standard is essentially the same as the South Dakota standard: courts draw all reasonable inferences in the nonmoving party's favor and, without weighing the evidence, determine whether there is a sufficient evidentiary basis to support the verdict. Garcia v. City of Trenton, 348 F.3d 726, 727 (8th Cir. 2003); Stensland v. Harding Cty., 872 N.W.2d 92, 95 (S.D. 2015). Judgment as a matter of law should be granted only when "all of the evidence points in one direction and is susceptible to no reasonable interpretation supporting the jury verdict." Garcia, 348 F.3d at 727 (quotation omitted); accord Stensland, 872 N.W.2d at 95 ("If sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law is not appropriate." (quoting Huether v. Mihm Transp. Co., 857 N.W.2d 854, 860 (S.D. 2014))).

Isuzu's motion for judgment as a matter of law makes two main arguments. First, Isuzu argues that it is entitled to judgment as a matter of law on the statutory wrongful termination claim because no reasonable jury could have found in SFK's favor on this claim. Isuzu contends that it clearly established that SFK engaged in conduct that was injurious or detrimental to SFK's customers or the public welfare. Next, Isuzu argues that it prevailed on claim III and that it is entitled to judgment as a matter of law on claim IV.

**A. Statutory Wrongful Termination Claim**

Isuzu's argument for judgment as a matter of law on the statutory wrongful termination claim turns in large part on its interpretation of SDCL § 32-6B-45. Isuzu contends that because the statute does not quantify how injurious or detrimental conduct must be to satisfy subsection (7), any injurious or detrimental conduct is sufficient to terminate a dealership without providing a cure period. Under this interpretation, Isuzu argues, any reasonable jury would have found that SFK billing Fed Ex directly for warranty service work and submitting to Isuzu a claim for 53.1 OLH constituted conduct that was injurious or detrimental to SFK's customers and the public.[14]

In determining the plain meaning of a statute under South Dakota law, courts do not consider statutory phrases in isolation but rather look to the language of the statute as a whole. South Dakota v. I-90 Truck Haven Serv., Inc., 662 N.W.2d 288, 291 (S.D. 2003). Section 32-6B-45 prohibits franchisors from terminating dealership agreements "without good cause." The statute defines "good cause" as "failure by a vehicle dealer to substantially comply with essential and reasonable requirements imposed upon the vehicle dealer by the vehicle dealership agreement, if the requirements are not different from those requirements imposed on other similarly situated vehicle dealers by their terms." SDCL § 32-6B-45. If a franchisor terminates a vehicle dealer under this definition of good cause, it must provide the vehicle dealer with notice and an opportunity to cure. Id. Although Isuzu tried to claim that it provided notice and an opportunity to cure, Isuzu's letter of termination plainly did not do so. Pl.'s Ex. 16.

Subsections (1) through (7) of § 32-6B-45 list several grounds for termination for which notice and an opportunity to cure are not required, including selling the dealership, bankruptcy of the dealership, moving the dealership without permission, closing the dealership, committing a

---

[14]At oral argument on its motion for a new trial, Isuzu stretched its argument even further to assert that subsection (7) of § 32-6B-45 allows franchisors to terminate franchisees for conduct that is likely to inflict injury, even if no injury actually occurs. Doc. 183 at 47.

felony, or engaging "in conduct which is injurious or detrimental to the dealer's customers or to the public welfare." SDCL § 32-6B-45(1)–(7). The lack of a notice and cure requirement for terminations under subsections (1) through (7), along with the fact that the grounds for termination under subsections (1) through (6) are all serious, undercuts Isuzu's argument that *any* injurious or detrimental conduct, no matter how insignificant, satisfies subsection (7).

In any event, regardless of the degree of injury or detriment required under § 32-6B-45, Isuzu is not entitled to judgment as a matter of law on SFK's statutory wrongful termination claim. As to Isuzu's claim that SFK billing Fed Ex for warranty work was injurious or detrimental to SFK's customers or the public welfare, SFK presented evidence that it fixed the transmission correctly and returned the truck to Fed Ex, Doc. 138-1 at 99; that Isuzu refused to pay SFK for the work on the Fed Ex truck, Pl.'s Ex. 61; Doc. 138-1 at 84, 93–97; Doc. 138-2 at 81–84; Doc. 138-5 at 23; that SFK had an agreement with Fed Ex allowing it to bill Fed Ex for unpaid warranty claims, Doc. 138-1 at 99; that Fed Ex never paid the bill SFK sent it, Doc. 138-6 at 159; that Fed Ex had SFK do work on an Isuzu truck even after SFK sent Fed Ex the transmission bill, Doc. 138-4 at 59–60; and that Isuzu had given SFK an opportunity in January 2015 to continue operating an Isuzu franchise despite SFK's alleged injurious conduct to Fed Ex, one of Isuzu's most important customers, Pl.'s Ex. 18. A reasonable jury could conclude from this evidence that SFK did not cause Fed Ex any injury or detriment by sending it a bill for the transmission repair.

A reasonable jury could also conclude that SFK's submission of the 53.1 OLH claim was not injurious or detrimental to SFK's customers or the public welfare. SFK offered evidence that the 53.1 OLH claim was a mistake rather than a "false" or "fraudulent" claim as Isuzu argued. Doc. 138-1 at 103–04, 109–111; Doc. 138-2 at 120–22; Pl.'s Ex. 17. Mills testified that he had

originally typed 5.31 hours of OLH into the ICS system, but that a computer glitch had moved the decimal one number to the right. Doc. 138-2 at 120, 182. Although Isuzu responded on ICS that the claim was excessive, it did not specifically mention that the claim asked for 53.1 hours of OLH. Doc. 138-2 at 121–22. Mills testified that although he could not remember for sure, he believed that he did not learn that 53.1 OLH had been submitted until September 2014. Doc. 138-2 at 121–22. Mills corrected the 53.1 OLH claim to 5.3 OLH by September 3, 2014, and neither Isuzu nor any of its customers paid SFK for 53.1 hours of OLH.

Isuzu's own testimony on the 53.1 OLH claim revealed that Isuzu was inflating the seriousness of this mistaken submission. Robinson testified that if SFK had corrected the 53.1 OLH claim in September 2014 (it had), he would not have mentioned the claim in the October termination letter (he did anyway). Doc. 138-5 at 217. Cunningham testified on direct examination that Mills had not fixed the 53.1 hour claim for OLH by October 17, 2014, the date Isuzu sent SFK the termination letter. Doc. 138-4 at 186, 234–35. On cross examination, however, when presented with a document that conflicted with her testimony, Cunningham agreed that she knew Mills had corrected the OLH from 53.1 to 5.3 by September 3, 2014. Doc. 138-4 at 237–38. She also admitted that she did not tell Robinson that the 53.1 hour claim had been corrected when he sent her a draft of the termination letter on October 16, 2014, and asked whether she had any concerns with it. Doc. 138-4 at 241. Because a reasonable jury had ample evidence to find in favor of SFK on the § 32-6B-45 claim, Isuzu's motion for a new trial on the statutory wrongful termination claim is denied.

## B. Claims for breach of the implied covenant of good faith and fair dealing

Isuzu contends that it is entitled to judgment as a matter of law on claim III—SFK's claim that Isuzu breached the implied covenant of good faith and fair dealing by violating SDCL

§§ 32-6B-58 and 32-6B-61—because the jury refused to award damages for Isuzu's failure to pay adequate time for warranty work.[15] Isuzu's motion for judgment as a matter of law on this ground is denied. The jury found that Isuzu had failed to pay SFK adequate time for warranty work, that Isuzu's violation of §§ 32-6B-58 and 32-6B-61 prevented SFK from receiving the reasonably expected benefits under the contract, and that Isuzu's conduct legally caused SFK damage. Doc. 135. Although the jury did not award SFK any money under the paragraph of the verdict form asking what damages SFK suffered as a result of Isuzu's failure to pay adequate time for warranty work, the jury did award SFK $76,000 under the paragraph asking what damages SFK suffered because Isuzu failed to pay SFK anything at all for certain warranty work. Doc. 135 at 5–6. This Court had instructed the jury to avoid duplicating a damages award on SFK's claims for underpayment of warranty work; the paragraph of the verdict form asking what damages SFK suffered because Isuzu failed to pay SFK anything at all for certain warranty work instructed the jury that the amount it awarded "should not duplicate whatever amount, if any," the jury awarded for claim III. Doc. 135. During a discussion with counsel after receiving the verdict, this Court explained that it understood the jury's award of $76,000 in damages as going to both Isuzu's failure to pay adequate time for warranty work and Isuzu's failure to pay any money at all for certain warranty work. Doc. 138-7 at 81–82. That is, the jury determined that Isuzu's failure to pay adequate time for warranty work and its failure to pay any money at all for certain warranty work caused SFK $76,000 in damages.[16] When asked whether he agreed with this interpretation of the jury's verdict, Isuzu's counsel said "I don't think I could say one way or

<hr>

[15]The jury found in Isuzu's favor on the other aspect of claim III, in which SFK alleged that Isuzu violated the implied covenant of good faith and fair dealing by not paying it a 58% markup rate on Isuzu parts. Doc. 135.

[16]The evidence made it difficult to segregate damages from non-payment of certain warranty claims from underpayment for warranty work.

another."[17]  Doc. 138-7 at 82.  Again, courts have a "duty to harmonize inconsistent verdicts, viewing the case in any reasonable way that makes the verdicts consistent."  Anheuser-Busch, Inc., 89 F.3d at 1347.  A reasonable view of the verdict is that the jury awarded $76,000 in damages based on Isuzu's failure to pay adequate time for warranty work and its failure to pay at all for certain warranty work.

Isuzu also argues that it is entitled to judgment as a matter of law on claims III and IV because SFK failed to present sufficient evidence that Isuzu limited or prevented SFK from being paid for adequate time spent on warranty work and being paid at all for certain warranty work.  Isuzu's argument ignores the evidence unfavorable to Isuzu on these claims.  Mills explained that Isuzu returned warranty claims at a higher rate than other manufacturers.  Doc. 138-2 at 106.  Mills estimated that NATT (the holding company of SFK and sixteen other dealerships) had approximately 10% of its warranty claims returned each month, and that Isuzu accounted for about 90% of these returned claims.  Doc. 138-2 at 106.  He said that Isuzu would continue to press SFK for more details about a warranty claim even after he had supplied Isuzu with the repair order.  Doc. 138-2 at 116–17.  Rush testified that SFK had a "constant difference" with Isuzu over whether SFK had supplied enough information to support its warranty claims.  Doc. 138-1 at 156.  Mills described one instance where SFK was not paid anything for an engine replacement despite having followed the engine replacement instruction guide, submitting a detailed repair order along with the ICS comments, and reducing the requested OLH.  Doc. 138-2 at 124–33.  Mills testified that he would occasionally agree to accept payment from Isuzu for fewer hours of OLH than what was worked so that SFK would at least get paid for its parts and standard repair time hours.  Doc. 138-2 at 117.  He explained that unlike other manufacturers

---

[17]SFK's attorney agreed with how the Court viewed the $76,000 damages award.  Doc. 138-7 at 82.

45

who would pay the undisputed portion of a warranty claim and then resolve the disputed OLH later, Isuzu would not make any partial payments to SFK. Doc. 138-2 at 109–110; see also, Doc. 138-5 at 192.[18] At times, the disputed OLH was a very small part of the overall warranty claim. For instance, the warranty claim for the Fed Ex truck SFK fixed in April 2014 was over $11,000. Doc. Pl.'s Ex. 61. Isuzu did not pay this claim because of a dispute over roughly 4.5 hours of OLH, which amounted to approximately $460. Doc. 138-5 at 24–25.

To be sure, Isuzu offered some evidence that Mills was at least partially responsible for the unpaid warranty claims. Cunningham testified that although before Mills's involvement, SFK would occasionally submit late warranty claims, Cunningham did not have any issues with those claims for OLH. Doc. 138-4 at 143–44. Nor did Cunningham have any complaints about the warranty claims from SFK's sister company Black Hills Truck and Trailer, which were submitted by NATT employee Tom Helland. Doc. 138-4 at 144. According to Cunningham, the problems with SFK's warranty claims began in 2013 when Mills assumed responsibility for submitting the claims. Doc. 138-4 at 144. She explained that SFK's claims for OLH increased under Mills and that these claims were excessive and unsupported by proper explanations. Doc. 138-4 at 144–45. In Cunningham's experience, Mills also took longer than other dealers to respond to requests for information about OLH. Doc. 138-4 at 156–57.

---

[18]There was no evidence that Isuzu made a partial payment to SFK on a warranty claim and agreed to resolve the disputed portion at a later time. However, Rossetti testified on direct that Isuzu had what it called an "add credit" that would allow undisputed portions of a claim to be paid while the disputed portion is handled. Doc. 138-5 at 173. He testified that a dealer could submit a warranty claim for the undisputed portion and then submit a second claim for the disputed portion once it explained the rationale for the additional time. Doc. 138-5 at 173. On cross, Rossetti testified that he never told Mills about the add credit option, did not know whether Cunningham had done so, and was unaware of any document involving SFK in which the term add credit was used. Doc. 138-5 at 192. No one else testified to this add credit system, and SFK evidently neither knew of nor used the add credit option.

Nevertheless, the evidence is such that a reasonable jury could conclude that Isuzu limited or prevented SFK from receiving the benefits of the franchise agreement by abusing its discretion to determine whether SFK had adequately explained its requests for OLH and not paying SFK at all for warranty work that was undisputed. As for the damages the jury awarded on claims III and IV, Rush testified on direct that Isuzu owed SFK $159,225.20 in unpaid and underpaid warranty claims. Doc. 138-4 at 59. He testified on rebuttal that SFK had 15 unpaid warranty claims and that the undisputed amount Isuzu owed for these claims was $76,000. Doc. 138-6 at 178. The jury had a sufficient evidentiary basis for the damages award on claims III and IV.[19]

Isuzu's next argument is that its affirmative defense of material breach of contract entitles it to judgment as a matter of law on claims III and IV. At Isuzu's request, this Court instructed the jury that "[a] material breach of a contract, unless it is waived, excuses the non-breaching party from further performance." Doc. 134 at 24. Isuzu asserts that the jury's conclusion on SFK's breach of contract claim—that SFK breached the agreement and would not have remedied any breach within a reasonable time period—means that the jury must have adopted Isuzu's affirmative defense that SFK committed a material breach. See Doc. 134 at 24, Instruction No. 21 (instructing on Isuzu's material breach defense). There is a difference, however, between a breach of contract and a *material* breach of contract that is sufficient to excuse the non-breaching party's performance. See 23 Richard A. Lord, Williston on Contracts § 63:3 (4th ed. 2002) ("A

---

[19]Isuzu complains about the lack of evidence supporting claims III and IV in both its motion for judgment as a matter of law and its motion for a new trial. To the extent that Isuzu is moving for a new trial on claims III and IV because of insufficient evidence, this motion is denied. Although the standard for a new trial is less stringent than the standard for judgment as a matter of law, the evidence discussed above demonstrates that there was no miscarriage of justice in the jury's finding for SFK on claims III and IV. This Court cannot order a new trial simply because the jury conceivably could have drawn different conclusions. White, 961 F.2d at 780.

party is not automatically excused from the future performance of contract obligations every time the other party commits a breach; if a breach is relatively minor and not of the essence, the plaintiff is still bound by the contract and may not abandon performance and obtain damages for a total breach by the defendant . . . ."). A breach of contract is only material if it "would defeat the very object of the contract." Miller v. Mills Const., Inc., 352 F.3d 1166, 1172 (8th Cir. 2003) (quoting Icehouse, Inc. v. Geissler, 636 N.W.2d 459, 465 (S.D. 2001)). Here, it is reasonable to view the jury as having decided that SFK committed a non-material breach[20] and that Isuzu was therefore not excused from further performance under the franchise agreement.

Isuzu's final argument is that SFK's claims for breach of the implied covenant were improper as a matter of law. All contracts in South Dakota contain an implied covenant of good faith and fair dealing. Nygaard v. Sioux Valley Hosps. & Health Sys., 731 N.W.2d 184, 193 (S.D. 2007). This implied covenant allows a plaintiff to sue for breach of contract when the defendant's lack of good faith "limited or completely prevented" the plaintiff from receiving the reasonably expected benefits of the contract. Id. at 193–94. A plaintiff suing under the implied covenant can recover for breach of contract even when the defendant did not violate the contract's express terms. Id. at 194. The implied covenant may not be used to rewrite a contract, however. Thus, "'[i]f the express language of a contract addresses an issue, then there is no need to construe intent or supply implied terms' under the implied covenant." Id. (alteration in original) (quoting Farm Credit Servs. of Am. v. Dougan, 704 N.W.2d 24, 28 (S.D. 2005)).

Isuzu argues that claims III and IV were improper because the franchise agreement and §§ 32-6B-58 and 32-6B-61 fully address the allegations in these claims. SFK alleged in its amended complaint that Isuzu acted in bad faith by rejecting SFK's warranty claims "based upon

---

[20]Part II.F. of this opinion provides an explanation of certain things the jury could have considered to be non-material breaches.

alleged insufficient documentation, and engaging in a pattern and practice of multiple rejections without basis." Doc. 47-6 at 16–17. Isuzu asserts that its service policy and procedures manual, which the franchise agreement at least partially incorporates, Doc. 47-6 at 40, "directly controls" SFK's allegations. However, the manual's section on which Isuzu relies merely states that Isuzu will pay for all warranty-eligible repairs, identifies the rate of compensation for labor and parts, and instructs dealers how to submit warranty claims on ICS. Pl.'s Ex. 7 at Section 13; see also Def.'s Ex. 203; Doc. 138-2 at 161–64. This section says nothing about the level of detail necessary to support a claim for OLH or Isuzu's ability to withhold the undisputed portion of a claim because of a disagreement about OLH.[21] Contrary to Isuzu's argument, this is not a situation where the express terms of the contract fully address an issue and thus leave no room for claims based on the implied covenant.

Isuzu's argument that §§ 32-6B-58 and 32-6B-61 supplant claims III and IV fares no better. Although these sections address compensation for warranty repairs, they do not specify the level of detail necessary to support a claim for OLH or Isuzu's ability to withhold the undisputed portion of a claim because of a disagreement about OLH. Isuzu's motion for judgment as a matter of law is denied.

## IV. Motion for Remittitur

---

[21]During the hearing on Isuzu's post-trial motions, this Court asked Isuzu for the contract provisions addressing the issues raised in claims III and IV, including the specific contract provision describing the level of detail necessary for an OLH request. Doc. 183 at 42, 44. Isuzu referred to the service policy and procedures manual in general, and said that while it was not trying evade this Court's question, the manual was "hundreds of pages," which made it difficult to identify all of the provisions addressing the issues raised in claims III and IV. Doc. 183 at 43–45. This Court has "no duty to search a record, especially one this long, if counsel does not supply adequate references to it, for evidence to support a party's arguments." Johnson v. Baptist Med. Ctr., 114 F.3d 789, 790 (8th Cir. 1997).

Isuzu moves for remittitur of the $1,600,000 award on the statutory wrongful termination claim, arguing that it is unsupported by the evidence. The traditional federal standard is that remittitur is appropriate "only when the verdict is so grossly excessive as to shock the conscience of the court." Eich v. Bd. of Regents for Cent. Mo. State Univ., 350 F.3d 752, 763 (8th Cir. 2003) (quoting Ouachita Nat'l Bank v. Tosco Corp., 716 F.2d 485, 488 (8th Cir. 1983) (en banc)). Because this is a diversity action, South Dakota substantive law applies to determine whether the damages award is excessive, Two Rivers Bank & Tr. v. Atanasova, 686 F.3d 554, 566 (8th Cir. 2012); Rustenhaven v. Am. Airlines, Inc., 320 F.3d 802, 805 (8th Cir. 2003); Manus v. Am. Airlines, Inc., 314 F.3d 968, 973 (8th Cir. 2003); Schaefer v. Spider Staging Corp., 275 F.3d 735, 737–38 (8th Cir. 2002), but federal procedural law controls "those issues involving the proper review of the jury award by a federal district court," Schaefer, 275 F.3d at 738 (quoting Browning-Ferris Indus. of Vermont, Inc. v. Kelco Disposal, Inc., 492 U.S. 257, 279 (1989)). Thus, this Court's "role . . . is to determine whether the jury's verdict is within the confines set by state law, and to determine, by reference to federal standards developed under Rule 59, whether a new trial or remittitur should be ordered." Schaefer, 275 F.3d at 738 (quoting Browning-Ferris, 492 U.S. at 279). When a verdict is excessive, the court may order a remittitur, if the plaintiff will accept that remedy, or order a new trial on damages, if the plaintiff refuses to accept the remittitur. Thorne v. Welk Inv., Inc., 197 F.3d 1205, 1212 (8th Cir. 1999).

Here, there are two potential standards for determining whether a verdict is excessive under South Dakota law. One standard comes from Schuler v. City of Mobridge, where the Supreme Court of South Dakota explained that a verdict is excessive if damages awarded are "so excessive as to strike mankind, at first blush, as being, beyond all measure, unreasonable and outrageous, and such as manifestly show the jury to have been actuated by passion, partiality,

prejudice or corruption. In short, the damages must be flagrantly outrageous and extravagant." 184 N.W. 281, 283 (S.D. 1921) (quotation omitted). Isuzu argues, however, that Osterkamp v. Alkota Manufacturing, Inc., 332 N.W.2d 275 (S.D. 1983), requires this Court to apply a different, less exacting standard. Osterkamp was a breach of contract case in which the state court granted the employer a new trial under SDCL § 15-6-59(a). Section 15-6-59(a) provides in relevant part that a new trial may be granted if there are "[e]xcessive or inadequate damages appearing to have been given under the influence of passion or prejudice," SDCL § 15-6-59(a)(5), or if there is "insufficiency of the evidence to justify the verdict or other decision," SDCL § 15-6-59(a)(6). The trial court in Osterkamp granted a new trial because it believed the damages were excessive. In reversing the trial court, the Supreme Court of South Dakota explained that while the Schuler standard for excessiveness should apply in cases where "there is no definite measure of damages," like tort actions, it should not apply to cases where a definite measure of damages exists, like contract actions. Osterkamp, 332 N.W.2d at 278–79. Instead, a new trial should be granted in a contract action if "the evidence is shown clearly insufficient to support the verdict." Id. at 279 (citing SDCL § 15-6-59(a)(6)).

Isuzu argues that under Osterkamp, when the measure of damages is definite, damages are excessive "where the evidence is shown clearly insufficient to support the verdict." According to Isuzu, the damages in this case are definite because they result from a statutory violation rather than a tort. This Court need not decide whether Osterkamp applies because the jury's award on claim I is excessive even under the more stringent standard set forth in Schuler.

The jury awarded SFK $1,600,000 in lost net profits from no longer being an Isuzu dealer. Doc. 135 at 5. To arrive at this amount, the jury necessarily had to rely on Rush's testimony that SFK would have retained the Isuzu franchise for several years and continued to

grow the franchise at a significant rate, if only Isuzu had not wrongfully terminated it. SFK suggests that the jury awarded what appears to be either 1) seven to eight years of damages using Rush's assumptions; or 2) approximately ten years of damages using a year-one loss of $159,000 and a growth rate roughly equal to inflation. SFK also hypothesizes that the jury could have arrived at $1,600,000 by awarding ten years of damages at a lower year-one figure and a high growth rate or fifteen years of damages with a lower growth rate. The problem with SFK's assumptions, and the jury's award, is that the evidence shows that SFK simply did not value the Isuzu franchise enough to perform under the franchise agreement (after all the jury found that SFK was in breach of the franchise agreement and that it would not have cured the breach within a reasonable time period), or to seek to retain it (after all SFK refused to reply to Isuzu's communications in August and October of 2014 addressing issues with SFK's performance), let alone grow it much beyond 2014. See Doc. 135 at 3–4.

The Isuzu franchise was never going to be a large part of SFK's business. From SFK's perspective, SFK's lines of short-nose conventional trucks sell better in the Sioux Falls market than the cab-over model Isuzu manufactures. Doc. 138-1 at 144; Doc. 138-1 at 25–26. Thus, SFK chose not to promote Isuzu truck sales like it promoted the sales of some of its other truck lines. Doc. 138-3 at 18–19, 25. In fact, SFK never spent the co-op funds Isuzu allotted it for advertising, Doc. 138-1 at 147; Doc. 138-3 at 28, and did not hang an Isuzu sign until over a year after it got the Isuzu franchise, Doc. 138-4 at 216; Def.'s Ex. 279. SFK sold only six Isuzu trucks total in the approximately five years it was an Isuzu dealer. Doc. 138-1 at 50; Pl. Ex. 2. SFK's vice president of sales Michael Rush not only ignored Isuzu's manager Cunningham when she tried to contact him about SFK's sales or lack of sales of Isuzu trucks, but also chose not to meet with Cunningham and other Isuzu representatives when they traveled to SFK. Doc.

138-3 at 29–30; Doc. 138-4 at 214–15, 217–18. William Rush testified that he had been to dealer meetings for Kenworth and Volvo, but that he had never attended any Isuzu dealer meetings because he did not think the cost was justified. Doc. 138-1 at 137–38. Rush also explained that while Isuzu had asked him to have two service technicians fully trained on Isuzu trucks, he felt that one fully-trained technician was sufficient given the Sioux Falls market for Isuzu trucks. Doc. 138-1 at 67–68. Even so, SFK never had a single technician that was fully trained on Isuzu trucks. Doc. 138-1 at 150; Doc. 138-2 at 144–45. Wersal testified that the sale of Isuzu parts was not a significant enough portion of SFK's business to justify sending any of SFK's employees to do training on Isuzu parts. Doc. 138-3 at 48. And while SFK did profit from selling Isuzu parts and doing service on Isuzu vehicles, the amount of service work SFK did for Isuzu was much smaller than the amount it did for Kenworth. Doc. 138-2 at 140. Rush told Cunningham, Becker, and Donaldson that SFK's outstanding warranty claims with Isuzu were small in comparison to what SFK had outstanding with other manufacturers. Doc. 138-4 at 167–68; Doc. 138-5 at 72, 121.

SFK's conduct in late 2013 and early 2014 shows a level of indifference towards the Isuzu franchise. For example, Mills was at best slow in responding to Cunningham, sometimes waiting months before sending her the documents she asked for. Doc 138-4 at 150–54; Def.'s Exs. 130–34, 137, 140. And the request he and other SFK employees submitted for a parts markup on Isuzu warranty repairs was at best haphazard. SFK first told Isuzu that its standard parts markup rate was 72%, then said it was 66%, and finally settled on 58%, but never bothered to document those figures and could not prove the 58% markup rate at trial. Mills admitted on cross-examination that although he had pulled hundreds of repair orders for Kenworth when asking it for a parts rate increase, he did not do so when SFK requested an increase from Isuzu,

even though Isuzu made that request. Doc. 138-2 at 168–69. The documents SFK actually submitted to support the 58% markup rate were unhelpful. Indeed, Wersal agreed at trial that the document he emailed Cunningham to establish that SFK's markup rate was 58% was incomprehensible. Doc. 138-3 at 50–52. As it turned out, SFK did not consistently apply a 58% markup rate on Isuzu parts; Rush and Wersal both testified that SFK would occasionally charge a lower rate. Doc. 138-2 at 19–20; Doc. 138-3 at 50. Isuzu arranged to have three Isuzu representatives travel to Sioux Falls to meet in person at SFK in May 2014 to discuss SFK's sales and warranty claims. Michael Rush, who was the vice president of sales, and Mills, who was responsible for submitting warranty claims to Isuzu, were both aware of the meeting, but neither bothered to attend.

If SFK paid more attention to the Isuzu franchise after the May 2014 meeting, this did not last for long. Rush did not respond to Donaldson's June 2014 email discussing the unpaid warranty claims or Rossetti's August 2014 letter expressing concern about the claims Mills had been submitting. Nor did Rush respond to Rossetti's October 8, 2014 email in which Rossetti said that billing Fed Ex violated the franchise agreement and asked to speak with Rush about this "urgent and serious" matter. And when Isuzu sent Rush the termination letter which, while not providing a cure period at least invited SFK to contact Isuzu if it wanted to resolve the parties' dispute, SFK sued Isuzu rather than responding and attempting to keep the Isuzu franchise.[22] In sum, SFK in the last half of 2014 did not act as though it wanted to retain and work to grow the Isuzu franchise for years to come.

---

[22]Rush also did not respond to Isuzu in January 2015 when Robinson sent him a letter saying that Isuzu was "willing to consider" providing an additional period for SFK to cure its alleged breaches. However, Isuzu sent this letter after it was sued and gave Rush just two days to respond, so it is quite understandable why Rush chose not to respond in January of 2015.

SFK's conduct and attitude towards the Isuzu franchise did not go unnoticed by the jury, who found that SFK not only breached the franchise agreement, but also would not have remedied the breach within a reasonable time period. Although SFK's breach was not material, it is difficult to believe that a party that could not be bothered to remedy its breach of a franchise agreement would nevertheless go on to operate and dramatically grow the franchise for many years. It is equally difficult to believe that a company would not make some effort to keep a franchise if the company actually thought it could make anywhere near the amount of net profits Rush testified to at trial. The circumstances here—including SFK's limited efforts to train its staff on Isuzu products, its indifferent approach to the Isuzu franchise in late 2013 and early 2014, the refusal to respond to Isuzu's repeated communications making clear there were serious problems with the parties' relationship, and the jury's conclusion that SFK breached the franchise agreement and would not have remedied this breach within a reasonable time period— make the $1,600,000 award, which necessarily depended on the assumption that SFK would have continued to operate and grow the Isuzu franchise for several years, "flagrantly outrageous and extravagant." Schuler, 184 N.W. at 283 (quotation omitted).

With the $1,600,000 award being excessive under state law, this Court can only remit the award to the highest amount the jury could reasonably find. McCabe v. Parker, 608 F.3d 1068, 1081 (8th Cir. 2010); Stogsdill v. Healthmark Partners, LLC, 377 F.3d 827, 834 (8th Cir. 2004); Ouachita Nat'l Bank, 716 F.2d at 488. Rush testified on direct examination that a proper method for valuing what SFK lost when Isuzu terminated the franchise was to take SFK's net income times a multiplier of four to six. Doc. 138-4 at 31–32.[23] Although Rush believed that this method was inadequate because it failed to account for the growth rate SFK had been

---

[23]Isuzu had drawn this testimony and methodology out of Rush during his deposition on damages taken during the trial. Doc. 126-2 at 40–65.

achieving, the assumption that SFK would have retained and continued to grow the Isuzu franchise for years to come was not reasonable under the circumstances described above. The multiplier method for determining SFK's damages was the only method Rush testified about that did not rest directly on growth rate assumptions. Under this method, the highest amount a jury could reasonably award is $957,756.84, which is SFK's net income in 2014 ($159,626.14) times a multiplier of six.[24] SFK thus has a choice: it can either accept the reduced award of $957,756.84 on claim I or opt for a new trial on damages for the statutory wrongful termination claim.

SFK argues that Diesel Machinery, Inc. v. B.R. Lee Industries, 328 F. Supp. 2d 1029 (D.S.D. 2003), aff'd, 418 F.3d 820 (8th Cir. 2005), shows that it was reasonable for the jury to assume that SFK would have continued to operate the Isuzu franchise for several years into the future had Isuzu not wrongfully terminated it. The district court in Diesel Machinery held that a business owner who had sold a product line for eight months was qualified to testify that the business would have continued to sell the product line for ten years had the manufacturer not terminated the parties' agreement. Id. at 1039–40. It was for the jury to decide whether the owner's ten-year damage projection was reasonable, the district court explained. Id. at 1040.

---

[24]Rush's testimony about SFK's net income in 2014 and the multiplier method of calculating damages did not violate Federal Rule of Evidence 701. Rush's calculation of net income was based on his review of SFK's records, Doc. 138-4 at 1–32, 79, and did not involve the sort of complex math that only an expert could perform. See Allied Sys., 304 F.3d at 792 ("Personal knowledge or perception acquired through review of records prepared in the ordinary course of business, or perceptions based on industry experience is a sufficient foundation for lay opinion testimony." (quotation omitted)); see also id. (rejecting argument that business officer's use of "accounting principles and methods to quantify damages" constituted expert testimony, where officer's testimony was limited to his first-hand knowledge obtained as part of his job). Isuzu agreed in its briefs to this Court that the multiplier method for calculating damages is "simplistic." Doc. 155 at 30. To the extent Isuzu argues that Rush should have disclosed the multiplier method and his calculation of SFK's net income earlier, any alleged late disclosure was harmless.

But the relationship between the business and manufacturer in <u>Diesel Machinery</u> was much different than the relationship between SFK and Isuzu. Unlike here, there were no problems in <u>Diesel Machinery</u> with warranty repairs, sales performance, training, or advertising. 418 F.3d at 828. More importantly, the plaintiff in <u>Diesel Machinery</u> had not breached the parties' agreement or violated any of the manufacturer's policies or guidelines. <u>Id.</u> The <u>Diesel Machinery</u> case does not save the $1,600,000 verdict for SFK from remittitur.

Isuzu's argument concerning the $1,600,000 award is that it must be remitted because Rush used an inflated growth rate, an unreasonably large gross profit rate to estimate future parts sales, a discount rate that was too small, and an unsupported fifteen-year damages period. These arguments are inapplicable to the multiplier method employed in this decision to remit the jury verdict. Isuzu also argues that this Court should remit the $76,000 the jury awarded on claims III and IV because this award has no support in the record. As explained in section III.B. of this opinion, there was a sufficient evidentiary basis for the $76,000 award on claims III and IV. Isuzu's motion for remittitur of the $76,000 is denied. Thus, this Court remits the damage award on the statutory wrongful termination claim to $957,756.84 plus postjudgment interest[25] if SFK accepts that amount as remittitur, to which would be added the $76,000 on the warranty non-payment claims plus prejudgment and postjudgment interest thereon.

## V.     Motion for Attorney's Fees

In diversity actions like this, state law generally governs whether a party may recover attorney's fees. <u>Ferrell v. W. Bend Mut. Ins. Co.</u>, 393 F.3d 786, 796 (8th Cir. 2005). Under

---

[25]Postjudgment interest on the jury's verdict is governed by 28 U.S.C. § 1961, which provides that "[i]nterest shall be allowed on any money judgment in a civil case recovered in a district court." 28 U.S.C. § 1961(a); <u>see also</u> <u>Maddox v. Am. Airlines, Inc.</u>, 298 F.3d 694, 699–700 (8th Cir. 2002). Under § 1961(a), postjudgment interest is "calculated from the date of the entry of the judgment." 28 U.S.C. § 1961(a).

South Dakota law, attorney's fees are not recoverable from another party unless allowed by contract or statute. In re S.D. Microsoft Antitrust Litig., 707 N.W.2d 85, 98 (S.D. 2005). Here, SFK prevailed on its claim that Isuzu violated SDCL § 32-6B-45, so it is entitled to reasonable attorney's fees and costs under SDCL § 32-6B-85. See SDCL § 32-6B-85 (explaining that "any vehicle dealer whose business or property is injured . . . by any violation of §§ 32-6B-45 to 32-6B-83 . . . may bring a civil action . . . to recover actual damages sustained, together with costs, disbursements, and reasonable attorney fees").

Determining the amount of attorney's fees that should be awarded starts with the lodestar, which is calculated by multiplying the number of hours reasonably expended by the reasonable hourly rate. In re S.D. Microsoft Antitrust Litig., 707 N.W.2d at 93 n.5, 99. Courts then consider the following factors to determine whether the lodestar should be increased or decreased:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) the fee customarily charged in the locality for similar legal services;
> (4) the amount involved and the results obtained;
> (5) the time limitations imposed by the client or by the circumstances;
> (6) the nature and length of the professional relationship with the client;
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
> (8) whether the fee is fixed or contingent.

Id. at 98–99 (quoting City of Sioux Falls v. Kelley, 513 N.W.2d 97, 111 (S.D 1994)). As the moving party, SFK bears the burden of demonstrating that its attorney's fees are reasonable. Highmark, Inc. v. Nw. Pipe Co., CIV 10-5089, 2016 WL 7017260, at *3 (D.S.D. Nov. 30, 2016).

SFK is requesting $728,584.05 in attorney's fees for work done from the beginning of this case in October 2014 through the April 2017 hearing on the post-trial motions. Docs. 158, 168, 169, 180, 181. This $728,584.05 figure represents 1,529.05 hours of work by attorney David Edwards at an hourly rate of $300; 551.5 hours of work by attorney Jeffery Haff at an hourly rate of $425; and 183.02 hours of work performed by several attorneys from Haff's firm at various hourly rates. Docs. 158, 159, 168, 169, 180, 181. SFK also seeks $73,882.99 in costs. Docs. 158, 159, 168, 169, 180, 181.

Isuzu does not dispute the reasonableness of the hourly rates SFK requests, but rather argues that SFK's fees should be reduced because SFK litigated the case inefficiently. As examples of SFK's inefficiency, Isuzu cites to attorney Edwards's supposed inexperience in franchise litigation, the ambiguity of SFK's amended complaint, SFK's late disclosure of Rush's testimony on damages, SFK's billing for tasks that Isuzu asserts to be clerical work, and supposedly duplicative work performed by Haff and Edwards. None of Isuzu's arguments about SFK's alleged inefficiency are persuasive, especially considering that Isuzu staffed the trial with four lawyers and two support staff whereas Edwards and Haff alone tried the case for SFK.[26] See Docs. 166, 174, 184. This was a complex and time-intensive case involving extensive document discovery, numerous depositions, cross-motions for summary judgment, mediation, a plethora of pretrial motions, a seven-day trial, and four heavily-briefed post-trial motions. Although SFK's attorneys billed a significant number of hours, much of this work was attributable to the aggressive manner in which Isuzu chose to litigate and defend the case. This Court has reviewed the billing statements from SFK's attorneys and finds that the hours expended were reasonable.

---

[26]Isuzu did not submit information on how many hours of attorney time its attorneys billed in defending the case.

Beyond the alleged inefficiency of SFK's attorneys, the parties' main dispute over the reasonableness of SFK's attorney's fees is whether SFK's fees should be reduced because it did not succeed on all of its claims. Both parties rely on Hensley v. Eckerhart, 461 U.S. 424 (1983), to support their positions. Hensley established a framework for determining what fees are compensable under 42 U.S.C. § 1988 when the plaintiff succeeded on some, but not all, of his claims. If a plaintiff's claims are unrelated, that is, "based on different facts and legal theories," then the court cannot award fees for time spent on the plaintiff's unsuccessful claims. Hensley, 461 U.S. at 434–35. But if the plaintiff's claims are based on "a common core of facts" or "related legal theories," time spent on the related but unsuccessful claims may still be compensable. Id. at 435. In such a case, courts "should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation." Id. A plaintiff who achieves "excellent results," is entitled to a "fully compensatory fee," which normally includes time spent on related but unsuccessful claims. Id. If the plaintiff's success is limited, however, paying the plaintiff for all of the hours expended may be excessive. Id. at 436.

Here, all of SFK's claims were based on a common core of facts and sought to remedy wrongs arising from the same series of events. This series of events began in or around September 2013 with a dispute over SFK's warranty claims and requested parts markup rate. SFK felt that it was being underpaid while Isuzu believed that SFK was not providing adequate documentation for its requests. The parties met to discuss these issues in May 2014, but the dispute over warranty claims and SFK's markup rate continued unabated. SFK's frustration over not being paid for warranty work on a Fed Ex truck eventually caused it to bill Fed Ex directly. This, in turn, prompted Isuzu to decide to terminate SFK as a dealer in late 2014, listing multiple rationales that SFK felt were contrived, but which had to be addressed at trial. SFK's attorneys

could not have litigated the statutory wrongful termination claim without developing and presenting the series of events giving rise to SFK's other claims. Given this overlap, the presence of the other claims in SFK's amended complaint made little difference in the total number of hours and costs billed by SFK's attorneys.

Isuzu argues that even if SFK's claims are related, this Court should reduce SFK's fees because of the "limited success" SFK achieved at trial. According to Isuzu, SFK achieved only limited success because it lost on the majority of the claims in its amended complaint. The Hensley case made clear, however, that when calculating a reasonable attorney fee, courts should focus on the results obtained rather than the ratio of winning claims to losing claims. 461 U.S. at 435 n.11. SFK's attorneys achieved excellent results, indeed even excessive damages, with a jury verdict of $1,600,000 on the statutory wrongful termination claim. Although this Court is remitting a portion of the verdict, SFK still stands to recover over $950,000 in damages on the statutory wrongful termination claim alone. This result is significant enough to justify awarding the attorney's fees SFK requests.[27]

Isuzu also argues that the statutory wrongful termination claim was "merely an afterthought" to SFK's declaratory judgment claims. That argument stretches credulity. The high bar for termination under SDCL § 32-6B-45, Isuzu's failure to provide a notice and cure period, and the potential to recover future lost profits and attorney's fees made the statutory wrongful termination issue SFK's central claim from the very beginning.

---

[27]Of course, SFK's success on the statutory wrongful termination claim could prove to be ephemeral. If SFK retries the issue of damages on the wrongful termination claim but does not achieve the same level of success that it achieved at the first trial, this Court would reevaluate the award of attorney's fees to SFK. See Thomas v. Tex. Dep't of Criminal Justice, 297 F.3d 361, 373 (5th Cir. 2002) (explaining that because the court had ordered remittitur of the plaintiff's emotional distress damages, it would also vacate the attorney's fees award since "the plaintiff's level of success can critically influence the proper amount of fees").

Isuzu's final argument is that SFK's attorney's fees should be reduced because SFK blocked resolution of this case. Isuzu contends that SFK could have avoided litigation by, for instance, responding to the termination letter or pursuing immediate injunctive relief so that it could remain an Isuzu dealer. Although these arguments and the other issues raised in Isuzu's briefs may suggest that SFK decided in late 2014 and early 2015 that this lawsuit was worth more to SFK than retaining the Isuzu franchise, they do not warrant reducing the attorney's fees. A plaintiff can still recover reasonable attorney's fees even though it chose not to resolve its case in the manner the defendant would have preferred.

## VI.  Conclusion

For the reasons stated above, it is hereby

ORDERED that Isuzu's motion for judgment as a matter of law, Doc. 150, is denied. It is further

ORDERED that Isuzu's motion for a new trial, Doc. 154, is denied except to the extent that this Court will conduct a new trial on damages for claim I if SFK refuses the remittitur described herein. It is further

ORDERED that Isuzu's motion for remittitur, Doc. 148, is granted only on claim I to the extent explained above. It is further

ORDERED that SFK's motion for attorney's fees and costs, Doc. 156, is granted. It is finally

ORDERED that SFK has fourteen days from the filing of this Opinion and Order to inform Isuzu and this Court whether SFK will accept the remittitur (at which point this Court will enter final judgment for $957,756.48 on claim I; plus $76,000 with prejudgment interest

thereon on the warranty underpayment claims; plus $728,584.05 in attorney's fees and $73,882.99 in costs) or whether it wants a new trial on damages for claim I.

Dated this _18th_ day of August, 2017.

BY THE COURT:

ROBERTO A. LANGE
UNITED STATES DISTRICT JUDGE